# United States Court of Appeals
## For the First Circuit

Nos. 02-2521, 03-1038, 03-1090

CHRISTY PETER MIHOS,

Plaintiff, Appellee/Cross-Appellant,

v.

JANE SWIFT, Individually and in her Official Capacity
as the ACTING GOVERNOR OF THE COMMONWEALTH OF MASSACHUSETTS,
Defendant, Appellant/Cross-Appellee, and

WILLIAM F. GALVIN, in his Official Capacity
as SECRETARY OF THE COMMONWEALTH OF MASSACHUSETTS,
Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Robert E. Keeton, U.S. District Judge]

Before
Torruella and Lipez, Circuit Judges,
and Schwarzer,* Senior U.S. District Judge.

Thomas A. Barnico, Assistant Attorney General, with whom
Thomas F. Reilly, Attorney General, and David R. Kerrigan,
Assistant Attorney General, was on brief, for appellant.
Harvey A. Schwartz, with whom Laurie Frankl and Rodgers,
Powers & Schwartz LLP were on brief, for appellee.

February 13, 2004

*Of the Northern District of California, sitting by
designation.

**LIPEZ**, **Circuit Judge**.  In 2002, then-Acting Governor Jane Swift fired Christy Peter Mihos and Jordan Levy from their positions as members of the Massachusetts Turnpike Authority after both men cast votes on the timing of certain toll increases on roads and tunnels in Massachusetts.  In this action, Mihos brought suit against Swift under the First and Fourteenth Amendments and 42 U.S.C. § 1983, alleging that Swift violated his First Amendment rights by removing him in retaliation for voting against her wishes on the toll increases.  Swift filed a motion to dismiss, raising the defense of qualified immunity.

Although the pleadings never advanced beyond Swift's motion to dismiss, the district court issued two rulings in this case, see Mihos v. Swift, 2002 WL 31455257 (D. Mass. 2002)("Mihos I") and Mihos v. Swift, 235 F. Supp. 2d 45 (D. Mass. 2002)("Mihos II").  In its first ruling, the court held that Swift violated Mihos's First Amendment rights, rejected Swift's qualified immunity defense, and denied Swift's motion to dismiss the claims against her in her individual capacity.  In its second ruling, the court entered a declaratory judgment that Swift violated Mihos's First Amendment rights but essentially changed course on qualified immunity, ruling that the law protected Swift against claims for damages arising from the violation of Mihos's First Amendment rights.  Specifically, the court entered a final judgment that included these provisions:

-2-

> (1) Plaintiff, Christy Peter Mihos, is awarded
> the following declaratory relief: It is hereby
> declared that Acting Governor Jane M. Swift,
> acting in her official capacity, violated his
> legally protected rights by retaliating
> against him for his voting, in his official
> capacity as Massachusetts Turnpike
> Commissioner, contrary to her communicated
> wishes.
>
> (2) All claims of Mihos for damages and for
> any other form of relief beyond that allowed
> in paragraph (1) of this judgment are
> DISMISSED WITH PREJUDICE.

Mihos II, 235 F. Supp. 2d at 63.

Swift appeals the court's denial of her motion to dismiss in Mihos I and the declaratory judgment entered against her in Mihos II. Mihos appeals the ruling denying his claims for damages.[1] For the reasons set forth herein, we affirm the denial of the motion to dismiss, vacate the declaratory judgment and the denial of damages, and remand for further proceedings.

---

[1]Three appeals have been filed in this case. The first, 02-2521, is Swift's appeal from the court's denial of her motion to dismiss in Mihos I. The second, 03-1038, is Mihos's appeal from the court's denial of damages in Mihos II. The third, 03-1090, is Swift's appeal from the court's award of a declaratory judgment to Mihos in Mihos II. Accordingly, Swift is designated as the "Defendant, Appellant/Cross-Appellee," and Mihos is designated as the "Plaintiff, Appellee/Cross-Appellant."

Additionally, William F. Galvin, in his official capacity as the Secretary of the Commonwealth of Massachusetts, is captioned as the "Defendant" on these appeals. After a state court proceeding ordered Mihos reinstated, Mihos's request for injunctive relief against Swift and Galvin was moot. Consequently, Mihos's motion to dismiss the claims against Swift in her official capacity and against Galvin entirely was granted on October 29, 2002, and there is no appeal pending in this matter regarding Secretary Galvin.

This case comes to us with two lengthy state court opinions and two district court opinions already filed. See Levy v. The Acting Governor, 435 Mass. 697, 761 N.E.2d 494 (Mass. 2002)("Levy I"); Levy v. The Acting Governor, 436 Mass. 736, 767 N.E.2d 66 (Mass. 2002)("Levy II"); Mihos I, 2002 WL 31455257 (D. Mass 2002); and Mihos II, 235 F. Supp. 2d 45 (D. Mass 2002). Because the extensive and undisputed factual background of this case has been set forth fully in published opinions, particularly in Levy II, we will confine our recitation of the facts to those pertinent to our holdings. The findings and analysis of each prior opinion are discussed below where relevant to the issues now before us on appeal.

## A.   Background

Governor Paul Cellucci appointed Christy Peter Mihos to the Massachusetts Turnpike Authority in December 1998 to fulfill the unexpired term of a departing member. In July 1999, Governor Cellucci reappointed Mihos to the Turnpike Authority to a full eight-year term. In May 2000, Mihos was elected vice-chairman of the Turnpike Authority.

The Turnpike Authority is "a body politic and corporate" and "a public instrumentality" authorized to operate the Massachusetts Turnpike and certain other roads known as the Metropolitan Highway System, including the Massachusetts Turnpike,

its extension into Boston, and the tunnels under Boston Harbor (the Sumner Tunnel, the Callahan Tunnel, and the Ted Williams Tunnel). Mass. Gen. Laws ch. 81A, §§ 1, 3. Three members, each of whom is appointed by the Governor, comprise the Turnpike Authority, and a two member quorum is required to conduct business. Id. at § 2. Through agreements with the Massachusetts Highway Department, the Turnpike Authority is responsible for certain aspects of the design and construction of the Central Artery/Tunnel Project, commonly known as "the Big Dig." Additionally, the Turnpike Authority bears sole responsibility for establishing tolls for the Turnpike, the Boston Harbor tunnel crossings, and the Metropolitan Highway System.

This toll-setting responsibility gave rise to the dispute between Mihos and Swift. The Executive Office of Transportation and Construction, the Turnpike Authority, and Governor Cellucci reached a consensus in late 1996 or early 1997 that tolls should be raised in 1997 and again in January 2002. In April 2001, then-Lieutenant Governor Swift took office as Acting Governor when Cellucci departed to accept an ambassadorial posting. During the latter part of 2001, Mihos and Levy became concerned about the proposals to implement toll increases on portions of the Massachusetts Turnpike in January 2002. Following investigations of the financial impact of the proposed toll increase, including consulting with attorneys, financial experts, and bond counsel for

-5-

the Authority, Mihos and Levy concluded that the toll increase was neither necessary as a matter of law nor in the best interests of the Turnpike Authority. Swift, however, supported the January 2002 increase.

On October 30, 2001, the three Turnpike Authority members met. A motion to raise the tolls in January 2002 failed for want of a second. Subsequently, a motion to increase the tolls in July 2002 was made, seconded, and passed in a 2-1 vote, with Mihos and Levy in favor. Swift delivered letters to Mihos and Levy dated November 16, 2001, notifying them that she was removing them from their positions as members of the Turnpike Authority.

B. The State Court Proceedings

Following receipt of those letters, Mihos and Levy filed a verified complaint in the Supreme Judicial Court of Massachusetts seeking, inter alia, declaratory relief that Swift lacked authority to remove members of the Turnpike Authority. The Supreme Judicial Court (SJC) rejected that argument and ruled instead that Mass. Gen. Laws ch. 30, § 9 "confers on the Acting Governor the power to remove a member of the Massachusetts Turnpike Authority in accordance with the terms of that statute." Levy I, 435 Mass. at 700.

After this ruling, Swift conducted hearings to determine whether she would remove Mihos and Levy from their positions on the Turnpike Authority for cause. By letter dated February 6, 2002,

-6-

Swift notified Mihos and Levy that she was removing them from office, asserting that the principal cause for removal was the fiscal irresponsibility of their votes at the October 30, 2001 meeting. Mihos and Levy again sought review, in the nature of certiorari, under Mass. Gen. Laws ch. 249, § 4, in county court. A single justice reversed and referred the matter to the full court. The SJC held, inter alia, that "the dispute involves a difference of opinion over policy that, in the circumstances, does not constitute substantial evidence of cause to remove" and vacated the order of dismissal. Levy II, 436 Mass. at 737. Mihos and Levy were duly restored to their positions and received back pay.

C. The District Court Proceedings

In addition to seeking review in state court, Mihos reserved his right to press his First Amendment claim in federal district court, which he did simultaneously with the state court proceedings.[2] In his district court complaint, Mihos alleged that Swift violated his First Amendment rights by retaliating against him because of his vote regarding the timing of the toll increases, and he sought, inter alia, declaratory relief, compensatory and punitive damages, and attorney's fees. Swift responded with a

_____

[2]See England v. Louisiana State Bd. of Med. Examiners, 375 U.S. 411, 421 (1964)(holding that a party may inform the state court "that he intends, should the state court[] hold against him on the question of state law, to return to [federal] District Court for disposition of his federal contentions.").

motion to dismiss, asserting the defense of qualified immunity. Both parties agreed that discovery should be stayed pending the resolution of the qualified immunity issue. On October 29, 2002, the district court rejected Swift's qualified immunity defense and denied her motion to dismiss. Mihos I, 2002 WL 31455257 at *7-*8. The district court then stated that "[t]he only remaining issue or issues this court must decide concern what relief to plaintiff is appropriate," and ordered that the parties' arguments on damages would be heard at the next case management conference. Id. at *8.

Pursuant to the district court's request, the parties submitted memoranda regarding plaintiff's claim for compensatory and punitive damages, as well as attorney's fees. Additionally, plaintiff sought discovery on issues relating to punitive damages. After denying the discovery request, the district court issued an opinion and final judgment on December 17, 2002. Mihos II, 235 F. Supp. 2d 45. The district court declared that Swift "violated [Mihos's] protected rights by retaliating against him for his voting." However, even though the district court previously had ruled in Mihos I that Swift was not entitled to qualified immunity, it held that Swift's own First Amendment interests served as a

shield to damages, essentially granting Swift qualified immunity,[3]

regardless of the terminology it employed.[4]

---

[3]We recognize that qualified immunity, in its full scope, shields public officials from the burdens of lawsuits and damages. See, e.g., Guzman-Rivera v. Rivera-Cruz 98 F.3d 664, 666 (1st Cir. 1996)("The qualified immunity defense exists not only to shield officials from liability for damages, but also to protect them from the general costs of subjecting officials to the risks of trial. . . .")(internal quotations and citations omitted).

[4]For example, the district court wrote in Mihos II that

> to comport with constitutional and other fundamental principles, [Swift] says qualified immunity should be recognized where a public official is required to exercise her judgment and form an opinion as to a balance between competing interests, so long as the official does not knowingly or recklessly rely upon irrelevant considerations or false information, or ignore contrary information.
>
> Here, defendant Swift asserts that she exercised her judgment and acted on her opinion in fact-specific circumstances as to which previous cases could only have been of limited assistance as to the appropriate weighing of clashing rights asserted by the parties. Swift says no showing has been made by Mihos that Swift acted in reckless disregard of information not supporting her opinion, or relied upon irrelevant or false considerations. Accordingly, she should be protected from personal liability.
>
> I conclude that First Amendment precedents identified in all the preceding parts of this opinion support this assertion by defendant Swift.

Mihos II, 235 F. Supp. 2d at 57.

Swift appealed the declaratory judgment in Mihos II and the denial of qualified immunity in Mihos I, and Mihos appealed the denial of any claim for damages in Mihos II. Both parties argue that the record before the district court in Mihos II was inadequate to support the ruling against them.

## II.

We first address the district court's rulings in Mihos II. Then, because the scope of the record necessarily affects our analysis of Swift's qualified immunity defense in Mihos I, we turn next to determining the record that was properly before the district court. Finally, we analyze Swift's qualified immunity defense in light of that record.

A. The Mihos II Rulings: Declaratory Judgment for Mihos and Judgment for Swift on Mihos's Damages Claim

Swift seeks reversal of the declaratory judgment that she violated Mihos's First Amendment rights, arguing that it was prematurely entered. We agree. For a plaintiff to overcome a qualified immunity defense, he must show that his allegations, if true, establish a constitutional violation; that the right was clearly established; and that a reasonable official would have known that her actions violated the constitutional right at issue. See Suboh v. District Attorney's Office of Suffolk Dist., 298 F.3d 81, 90 (1st Cir. 2002). However, the denial of qualified immunity to a defendant does not translate into a victory for a plaintiff on

-10-

the merits.  A determination that the "plaintiff's allegations, if true, establish a constitutional violation," <u>Hope</u> v. <u>Pelzer</u>, 536 U.S. 730, 736 (2002), does not mean that the plaintiff's allegations <u>are</u> true.  It simply means that the case may go forward.  The court had no basis for entering a declaratory judgment for Mihos on the constitutional violation claim.

The judgment for Swift on Mihos's damages claim presents a different problem.  Although the district court avoided the language of qualified immunity in its ruling against Mihos, its conclusion that Swift did not have to answer in damages for a violation of Mihos's First Amendment right was tantamount to a qualified immunity victory for Swift.  As such, the denial of damages in <u>Mihos II</u> was a reversal of the district court's ruling in <u>Mihos I</u>, which rejected Swift's qualified immunity defense entirely.  The overriding question is which qualified immunity ruling was correct.  If the court's rejection of qualified immunity in <u>Mihos I</u> was right, its acceptance of qualified immunity in <u>Mihos II</u> was wrong.  For reasons we shall explain, the district court's first ruling was correct.  Consequently, the district court erred in dismissing Mihos's damages claim.

B.  The Scope of the Record

When a motion to dismiss is based on the complaint, as it is here, the facts alleged in the complaint control.  <u>Behrens</u> v. <u>Pelletier</u> 516 U.S. 299, 309 (1996)("[T]he legally relevant factors

-11-

. . . will be different on summary judgment than on an earlier motion to dismiss.  At that earlier stage, it is the defendant's conduct <u>as alleged in the complaint</u> that is scrutinized for 'objective legal reasonableness.'")(emphasis in the original); <u>see also</u> <u>Dirrane</u>, 315 F.3d at 69 n.2.  However, as always, there are exceptions to the rule.  <u>Watterson</u> v. <u>Page</u>, 987 F.2d 1, 3 (1st Cir. 1993)(describing "narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiff's claim; or for documents sufficiently referred to in the complaint.")

At issue here is whether and to what extent one of these exceptions encompasses the SJC's decision in <u>Levy II</u>.  That is, we must determine whether the decision of the SJC in <u>Levy II</u> changed the rules applicable to a motion to dismiss when evaluating Mihos's claim in his federal lawsuit that Swift's motivation for firing him was constitutionally proscribed.  In her reply brief, Swift neatly sums up the course of action taken by the district court:  "the District Court assumed the facts alleged in the complaint to be true, disregarded allegations concerning the subjective intent of the Governor [and] relied on the decisions of the Supreme Judicial Court to explain the course of the proceedings and the Governor's stated grounds for removal. . . ."  We agree with Swift that this is the course of action the district court took; however, that course was misguided.

Because Swift's "motivation in effecting the discharge is an essential element of [Mihos's] constitutional claim," the motivations for Swift's actions are crucial to this case. Feliciano-Angulo v. Rivera-Cruz, 858 F.2d 40, 45 (1st Cir. 1988). As we explain in Part C.1.b. infra, the motivation element of the constitutional claim does not disappear at the qualified immunity stage. Acevedo-Garcia v. Vera-Monroig, 204 F.3d 1, 12 (1st Cir. 2000)(affirming "the rightness of the district court's consideration of motivation in rejecting the qualified immunity defense. . . .").

Here, relying on Levy II for findings about Swift's motivations for firing Mihos, the district court found that "[i]n the exercise of her discretion, Swift had concluded that Mihos'[s] 'acts and omissions concerning the Authority's finances, particularly during the time period culminating with the Authority's October 30, 2001[,] [b]oard meeting and immediately thereafter, were fiscally irresponsible, resulting in adverse consequences of substantially decreasing projected revenues of the Authority, damaging the Authority's credit outlook, and creating financial instability.'" Mihos II, 235 F. Supp. 2d at 48 (quoting Levy II, 436 Mass. at 744). Similarly, the district court determined, based on Levy II, that "Swift further found that the alternative revenue plan prepared by Mihos was created 'hurriedly' and in a 'haphazard' manner, and that it did not 'adequately'

-13-

compensate for the revenues that had been lost as a result of [Mihos's and Levy's] actions." Mihos II, 235 F. Supp. 2d at 48 (quoting Levy II, 436 Mass. at 746)(alterations in the original).

Based on these findings, the district court "conclude[d] that these claims by Mihos are barred by the First Amendment and other protections against an award of damages for the good faith performance of public duties by the Acting Governor of the Commonwealth." Mihos II, 235 F. Supp. 2d at 62 (emphasis added). Further, the district court characterized Swift as "an energetic, strong, and committed governor . . . who has rendered creditable service to the public by standing fast in the assertion of deeply held convictions." Id. Finally, the district court found that the "expressive elements of Swift's actions arise out of the exercise of her discretion in performing her duties as the Acting Governor of the Commonwealth. Swift was required to exercise that discretion because she was faced with what she perceived to be, among other things, gross fiscal irresponsibility on the part of [Mihos.]" Id. at 57-58.[5]

_____

[5]In reciting these reasons from Levy II, the district court ignored language in Levy II finding that many of the non-retaliatory reasons for the terminations advanced by Swift were supported by "no evidence." See, e.g., Levy II, 436 Mass. at 749-51 ("There was no evidence that the vote to 'delay' the toll increases violated any covenant in the 1997 and 1999 trust agreements or their corresponding bond prospectuses. . . . There is no evidence that Levy and Mihos failed to do anything legally required of them. . . . There is no requirement to generate 'new revenues'. The plan satisfies the Authority's existing obligations. . . . [Mihos's and Levy's] plan had not been the

-14-

Swift claims that the district court properly relied on Levy II in making these determinations regarding her motivations for firing Mihos because, according to Swift, federal courts may take judicial notice of related decisions of state courts when ruling on a motion to dismiss.[6]  In essence, Swift urges that the SJC's findings in Levy II estop Mihos from alleging in this federal lawsuit that her motives for firing him were other than those described by the SJC in Levy II.

This argument misapprehends the scope of issue preclusion:  "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a

_____

result of 'haphazard' planning. . . .  There was nothing haphazard about [Mihos's and Levy's] actions. . . .  Contrary to the Governor's contention, there was no obligation to vote on the proposed toll increases and the alternative revenue plan at the same time.")

[6]In her reply brief, Swift also urges that Levy II is part of the record because Mihos "made specific reference to the proceedings before the SJC in his complaint." See, e.g., Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)("documents sufficiently referred to in the complaint" can be properly considered on a motion to dismiss).  In paragraph 16 of the complaint, Mihos stated that "[f]ollowing proceedings in the Massachusetts Supreme Judicial Court, the defendant Acting Gov. Swift held hearings concerning the removal of Mr. Mihos and Mr. Levy."  This is the only reference in the complaint to the state court proceedings, and simple chronology compels the conclusion that Mihos was not referring to Levy II: the complaint was filed almost three months before Levy II was decided. We need not decide whether this reference is sufficient to expressly incorporate Levy I into the record.  The findings in Levy I are not germane to the issues on appeal, and neither party relies on Levy I for their legal arguments in the briefs.

-15-

subsequent action between the parties, whether on the same or a different claim." Restatement (Second) of Judgments § 27 (1982)(emphasis added). It follows from this hornbook definition of issue preclusion that the district court made improper use of Levy II in deciding Mihos II. The task before the SJC in Levy II was to decide whether Swift's stated reasons for terminating Mihos satisfied the "for cause" standard. The SJC did not address whether Swift's stated reasons were actually the reasons that motivated her actions. Indeed, the court stated specifically that "the Governor's good faith and honest judgment play no part in the instant matters affecting the Authority." Levy II, 436 Mass. at 749. In other words, the SJC accepted Swift's stated reasons as true for purposes of their analysis of "for cause" dismissal under Massachusetts law. Mihos's complaint alleges a different motivation: that "Swift was enraged" at Mihos's vote and fired him "in direct retaliation" in an act of "political interference and intimidation." The district court denied Mihos the opportunity to pursue discovery on these allegations, despite the central role that motivation plays in First Amendment political retaliation claims.

We conclude that the district court's reliance on Levy II in assessing Swift's actual motivation for firing Mihos was improper since that issue was never litigated. As we have said before, "when two adversaries concentrate in attempting to resolve

an issue importantly involved in a litigation, there is no unfairness in considering that issue settled for all time between the parties and those in their shoes. But . . . it is unfair to close the door to issues which have not been on stage center, for there is no knowing what the white light of controversy would have revealed." Farmington Dowel Prods. Co. v. Forster Mfg. Co., Inc., 421 F.2d 61, 79 (1st Cir. 1969).

The statements in Levy II related to Swift's motivation do not fall within one of the exceptions to the general rule that the facts alleged in the complaint control on a motion to dismiss. Accordingly, we limit the factual considerations in our qualified immunity analysis to the allegations in Mihos's complaint.[7]

### C. Qualified Immunity

Having ascertained the scope of the record before us, we now turn to Swift's qualified immunity defense. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). At least to the extent that the qualified immunity defense turns upon a purely legal question, we

---

[7]We need not address at this juncture the exact contours of the proper use of Levy I and Levy II in the proceedings on remand. Beyond Swift's attempted reliance on the motivation issue, neither party seeks to bring other findings in the Levy litigation into the record.

review qualified immunity determinations de novo. See Mitchell v. Forsyth, 472 U.S. 511, 530 (1985); see also Suboh v. District Attorney's Office of Suffolk Dist., 298 F.3d 81, 90 (1st Cir. 2002).

Drawing on Supreme Court precedent and our own case law, we employ a three-part test when determining if a public official is entitled to qualified immunity: (1) whether plaintiff's allegations, if true, establish a constitutional violation; (2) whether that right was clearly established at the time of the alleged violation; and (3) whether a similarly situated reasonable official would have understood that the challenged action violated the constitutional right at issue. Suboh, 298 F.3d at 90. See also Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982). The "Supreme Court has instructed us to start . . . with the question of whether the facts as alleged make out a violation of the First Amendment." Dirrane v. Brookline Police Dept., 315 F.3d 65, 69 (1st Cir. 2002)(citing Saucier v. Katz, 533 U.S. 194, 201 (2001))(emphasis in original). Accordingly, we take each of these issues in turn.

1. Constitutional Violation

Because Mihos alleged that Swift violated his First Amendment rights, the first step in our qualified immunity analysis breaks down into a three-part inquiry itself: (1) whether the speech involves a matter of public concern; (2) whether, when

-18-

balanced against each other, the First Amendment interests of the plaintiff and the public outweigh the government's interest in functioning efficiently; and (3) whether the protected speech was a substantial or motivating factor in the adverse action against the plaintiff.  Mullin v. Town of Fairhaven, 284 F.3d 31, 37-38 (1st Cir. 2002) (discussing the Supreme Court precedents that require each of these three inquiries: Connick v. Myers, 461 U.S. 138, 147-48 (1983)(matter of public concern requirement); Pickering v. Board of Educ., 391 U.S. 563 (1968)(balancing requirement); Mt. Healthy City School Dist. Bd. Educ. v. Doyle, 429 U.S. 274, 287 (1977)(substantial factor requirement)).  We address each of these items in sequence.

### a.  Matter of Public Concern

For purposes of the motion to dismiss, Swift did not contest that Mihos's vote on the toll increase was a matter of public concern.  Mihos I, 2002 WL 31455257, at *5.  Like the district court, we pause briefly to address the issue on the merits.

We are guided in this inquiry by the Supreme Court's holding in Connick: "Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record." 461 U.S. at 147-48.  Mihos's votes against the proposed January 2002 toll increase and for a July 2002 toll increase concerned a

matter of significant import related to financing the largest construction project in the country. Further, the timing of the increases would affect every person and corporation who used the Turnpike extension into Boston and the Boston Harbor tunnels.

"Where a public employee speaks out on a topic which is clearly a legitimate matter of inherent concern to the electorate, the court may eschew further inquiry into the employee's motives as revealed by the 'form and context' of the expression." O'Connor v. Steeves, 994 F.2d 905, 913-14 (1st Cir. 1993). There is no need for further analysis of the "public concern" issue. We conclude, as did the district court, that Mihos's votes involved a matter of public concern, satisfying the first prong of the constitutional violation analysis.

b. Balancing the Interests

The next step in determining whether Swift violated Mihos's constitutional rights is to balance the interests of Mihos and the public in Mihos's speech (his vote) against the "interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. . . ." Pickering, 391 U.S. at 568. See also Mullin, 284 F.3d at 39. This process is commonly known as "Pickering balancing."

It is here, in the Pickering balancing, that Swift's motivations for firing Mihos loom large. In evaluating the defendant's side of the scale, Pickering and its progeny instruct

-20-

courts to focus on the government's "legitimate interests in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." O'Connor, 994 F.2d at 915 (citing Pickering, 391 U.S. at 568-75). Accordingly, if Swift fired Mihos because she was concerned that the tangible results of his vote would negatively affect the efficient functioning of government services and the financial standing of the Turnpike Authority, she would have weighty interests on her side of the Pickering scale.[8] On the other hand, if Swift fired Mihos in a retaliatory fit of pique because she disagreed with his vote and wished to punish him, she would have no legitimate governmental interests on her side of the scale. Indeed, Swift's true motivation for firing Mihos for his vote is a core issue in this case.

Given the importance of Swift's motivation for firing Mihos for his vote, we must pause to address Swift's argument in her brief that "the state of mind of the public official is not relevant to the question of qualified immunity," citing to Harlow v. Fitzgerald, 457 U.S. 800, 816-17 (1982). This argument, along with citations to Harlow, is often made in First Amendment retaliation cases when defendants raise the qualified immunity defense. We are mindful that the Supreme Court in Harlow changed

---

[8]In making this observation, we express no opinion regarding the preclusive effect, if any, that Levy II might have on remand in evaluating the legitimacy of these concerns or Swift's ability to demonstrate them on the record.

-21-

qualified immunity doctrine to emphasize the objective, not subjective, nature of that inquiry. However, <u>Harlow</u> does not stand for the proposition that inquiries into defendants' subjective motivation is inappropriate in the <u>first step</u> of the qualified immunity analysis in assessing whether an intent-based constitutional violation has been alleged.[9]

Prior to <u>Harlow</u>, the <u>third step</u> of the qualified immunity inquiry consisted of both objective and subjective components: a defendant would not be entitled to qualified immunity "<u>if he knew</u> or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action <u>with the malicious intention</u> to cause a deprivation of constitutional rights or other injury. . . ." <u>Wood</u> v. <u>Strickland</u>, 420 U.S. 308, 322 (1975)(emphasis added). Under <u>Wood</u>, then, a plaintiff could usually avoid an adverse pre-trial qualified immunity ruling by merely alleging (1) a constitutional violation (2) of clearly established law (3) by a public official who either acted maliciously or knew that his actions would deprive the plaintiff of his constitutional rights. This third step involved an inquiry into the public official's subjective state of mind to assess

_____

[9]Although in many areas of the law there are important distinctions between "intent" and "motive," we use them here interchangeably because the Supreme Court does so in its qualified immunity jurisprudence. <u>See, e.g.</u>, <u>Harlow</u> v. <u>Fitzgerald</u>, 457 U.S. 800, 818 (1982) and <u>Crawford-El</u> v. <u>Britton</u>, 523 U.S. 574 (1998).

whether the official acted with malice or was aware of the constitutional violation that would flow from his actions.

Seven years later, in Harlow, the Supreme Court revisited the relevance of the public official's subjective state of mind in the qualified immunity analysis. First, the Court noted that "[t]he resolution of immunity questions inherently requires a balance between the evils inevitable in any available alternative." Harlow, 457 U.S. at 813. The Court also reiterated its concern that allowing insubstantial claims against public officials to proceed to trial exacted costs on society as a whole, "includ[ing] the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." Harlow, 457 U.S. at 814. The Harlow Court noted that Wood v. Strickland's "subjective element of the good-faith defense frequently has proved incompatible with our admonition . . . that insubstantial claims should not proceed to trial . . . [because] an official's subjective good faith has been considered to be a question of fact that some courts have regarded as inherently requiring resolution by jury." Harlow, 457 U.S. at 816.

Because of the incompatibility of the subjective inquiry with the need to dismiss insubstantial cases prior to trial, the Harlow Court found that "the dismissal of insubstantial lawsuits without trial--a factor presupposed in the balance of competing

-23-

interests struck by our prior cases--requires an adjustment of the 'good faith' standard established by our decisions." Harlow, 457 U.S. at 814-15. This "adjustment of the 'good faith' standard" was a reformulation of the third step of the qualified immunity test to eliminate the good-faith, subjective inquiry: "We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818 (emphasis added).

Harlow, then, did not affect the first step of the qualified immunity analysis: whether plaintiff's allegations, if true, establish a constitutional violation. Certain constitutional violations, including First Amendment retaliation claims, include defendant's motivations as a foundational element of the tort: Mihos's First Amendment retaliation claim "has no meaning absent the allegation of impermissible motivation." Acevedo-Garcia, 204 F.3d at 11.[10] While the Supreme Court has removed from the qualified immunity analysis inquiries into whether a defendant knew that he was violating plaintiff's constitutional rights or acted

_____

[10]The Supreme Court recently explained again that "[t]he reason why retaliating against individuals for their speech offends the Constitution is that it threatens to inhibit exercise of the protected right. Retaliation is thus akin to an 'unconstitutional condition' demanded for the receipt of a government-provided benefit." Crawford-El v. Britton, 523 U.S. 574, 589 n.10 (1998)(citations omitted).

maliciously to that end, this jurisprudence has not suggested that the "objectification" of the qualified immunity inquiry somehow removes the intent element in the "subset of constitutional torts [in which] motivation or intent is an element of the cause of action." Id. Accord Johnson v. Ganim, 342 F.3d 105, 117 (2d Cir. 2003)("Though the qualified immunity inquiry is generally an objective one, a defendant's subjective intent is indeed relevant in motive-based constitutional torts such as the one alleged by [plaintiff].").[11]

In Crawford-El v. Britton, 523 U.S. 574 (1998), the Supreme Court confirmed that although Harlow eliminated inquiries into the defendant's subjective state of mind in the third step of the qualified immunity analysis, it did not eliminate inquiries into the defendant's subjective state of mind in the first step of the qualified immunity analysis when plaintiff alleges an intent-based constitutional tort. While striking down a heightened pleading requirement for motivation-based constitutional torts, the Crawford-El Court stated that "a judicial revision of the law to bar claims that depend on proof of an official's motive" was not justified. Id. at 592. The Court went on to explain that "there is an important distinction between the 'bare allegations of

---

[11]Of course, if the constitutional tort itself does not include a subjective element such as intent, it would be an error to import such an element into the qualified immunity assessment of whether the plaintiff's allegations, if true, establish a constitutional violation.

-25-

malice' that would have provided the basis for rebutting a qualified immunity defense under Wood v. Strickland [the third step] and the allegations of intent that are essential elements of certain constitutional claims [the first step]." Id.

Emphasizing its concern with intrusive discovery into a public official's state of mind, the Court observed that under Wood, prior to Harlow, allegations of defendant's malicious intent to cause any injury at all to plaintiff--not just constitutional deprivations--"would have permitted an open-ended inquiry into [the official's] subjective motivation." Id. In contrast, the Court found that when assessing intent as an element of a constitutional violation, the motivation inquiry is not so broad as to allow discovery on any potential theoretical basis for the cause of defendant's alleged animosity towards plaintiff: "rather, [the motivation inquiry] is more specific, such as an intent . . . to deter public comment on a specific issue of public importance." Id.

The Court then observed that "existing law already prevents this more narrow element of unconstitutional motive [alleged as part of the underlying constitutional tort] from automatically carrying a plaintiff to trial." Id. This is true because a defendant might prevail on a qualified immunity defense in a case alleging an intent-based constitutional tort, without need to inquire as to her motives, if (1) the relevant law was not

clearly established, (2) the plaintiff's speech did not relate to a matter of public concern, or (3) the defendant showed that she would have reached the same decision even in the absence of the employee's protected speech. Id. at 592-93. In consequence, as noted by the Crawford-El Court, "unlike the subjective component of the immunity defense eliminated by Harlow, the improper intent element of various causes of action should not ordinarily preclude summary disposition of insubstantial claims." Id. at 593.

In Part IV of its opinion in Crawford-El, the Court recognized that even though a qualified immunity defense to an intent-based constitutional tort often can be resolved on grounds that avoid inquiries into the government official's motives, that will not always be so. Therefore, the Court found it "appropriate to add a few words on some of the existing procedures available to federal trial judges in handling claims that involve examination of an official's state of mind." Id. at 597. "First, the court may order a reply to the defendant's . . . answer under Federal Rule of Civil Procedure 7(a), or grant the defendant's motion for a more definite statement under Rule 12(e)."[12] Id. at 598. "Second, . . . the district court should resolve [the] threshold question [of

---

[12]Fed. R. Civ. P. 7(a) allows a court to "order a reply to an answer. . . ." Fed. R. Civ. P. 12(e) provides that "[i]f a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading. The motion shall point out the defects complained of and the details desired."

qualified immunity] before permitting discovery . . . [by] determin[ing] whether, assuming the truth of the plaintiff's allegations, the official's conduct violated clearly established law." Id. The Court then noted that "[i]f the plaintiff's action survives these initial hurdles and is otherwise viable, the plaintiff ordinarily will be entitled to some discovery. Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." Id. The Court described the ways in which the district court may limit the number, length, subject matter, time, place, and manner of depositions and interrogatories, as well as various discovery scenarios that would facilitate "the prompt and efficient resolution of the lawsuit. . . ." Id. at 599. Finally, the Court observed that "[b]eyond these procedures and others that we have not mentioned, summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." Id. at 600.

With its careful attention to the ways in which trial courts can control the examination of an official's state of mind pre-trial, the Supreme Court acknowledged in Crawford-El that the adoption of an objective standard for qualified immunity in Harlow did not foreclose all state of mind inquiries during the pre-trial consideration of qualified immunity when state of mind is an

element of the constitutional tort.[13]  Swift misreads <u>Harlow</u> in asserting that its reformulation of the qualified immunity defense makes her motivation in firing Mihos irrelevant to the qualified immunity analysis.  Therefore, if the qualified immunity defense

---

[13]When plaintiffs allege an intent-based constitutional tort, defendants asserting qualified immunity often quote the passage in <u>Crawford-El</u> stating that "improper motive is irrelevant on the issue of qualified immunity. . . ." 523 U.S. at 589.  In doing so, they take the passage out of context.  In this portion of <u>Crawford-El</u>, the Court is explaining how <u>Harlow</u> removed the subjective elements from the <u>third step</u> of the qualified immunity inquiry so that "bare allegations" that the defendant maliciously or knowingly violated plaintiff's constitutional rights would no longer suffice to overcome a qualified immunity defense.  As <u>Crawford-El</u> explains in the same paragraph, its holding in <u>Harlow</u> "that 'bare allegations of malice' cannot overcome the qualified immunity defense did not implicate the elements of the plaintiff's initial burden of proving a constitutional violation," which is the <u>first step</u> in the qualified immunity inquiry.  As we have explained, the rest of the <u>Crawford-El</u> opinion confirms this point.

Indeed, in the footnote immediately preceding the statement that "evidence of improper motive is irrelevant on the issue of qualified immunity," <u>Crawford-El</u> quotes an opinion of Justice Ginsburg, when she was a judge on the District of Columbia Circuit, and calls it a "correct understanding of <u>Harlow</u>. . . ."

> Had the Court [in <u>Harlow</u>] intended its formulation of the qualified immunity defense to foreclose <u>all</u> inquiry into the defendants' state of mind, the Court might have instructed the entry of judgment for defendants Harlow and Butterfield on the constitutional claim without further ado.  In fact, the Court returned the case to the district court in an open-ended remand, a disposition hardly consistent with a firm intent to delete the state of mind inquiry from every constitutional tort calculus.

<u>Crawford-El</u>, 523 U.S. at 589 n.11 (quoting <u>Martin</u> v. <u>D.C. Metro. Police Dep't</u>, 812 F.2d 1425, 1432 (D.C. Cir. 1987)(alteration and emphasis in original)).

proffered in her motion to dismiss does not identify proper grounds apart from motive for dismissing the case, and if the thrust of her motion to dismiss is simply to deny that she acted with the constitutionally proscribed motive, she is unlikely to succeed.

Apart from her misguided argument that motivation is always irrelevant to the qualified immunity inquiry, Swift only argues that no constitutional violation occurred because her termination of Mihos was motivated by her legitimate concerns for the public's interest rather than by a desire to politically retaliate against him. However, as we have previously explained, on a motion to dismiss we must accept as true the allegations in Mihos's complaint about Swift's motivation. In the Pickering balance, the exercise to which we now return, these allegations produce a decisive tilt for Mihos.

We look first to Mihos's side of the scale to assess "the interests served by [Mihos's First Amendment activity] – including [his] interests in communicating, and the interests of the community in receiving, information on matters of public importance. . . ." O'Connor, 994 F.2d at 915. Public officials have a strong interest in voting their conscience on important issues without having to suffer retaliatory recriminations from their superiors. See, e.g., Connick v. Myers, 461 U.S. 138, 149 (1983)("[I]t is essential that public employees be able to speak out freely without fear of retaliatory dismissal."). The public

also has a substantial interest in members of public authorities being able to freely cast their votes in accordance with their best judgment, without fear of political interference and intimidation. See Butz v. Economou, 438 U.S. 478, 506 (1978)(noting "public interest in encouraging the vigorous exercise of official authority"). Together, Mihos's and the public's interests weigh heavily on their side of the Pickering balance.

In turning to Swift's side of the balance, we find almost nothing because of the posture of this case. We have already explained why the Levy II descriptions of Swift's reasons for firing Mihos cannot trump the contrary allegations in Mihos's complaint. In consequence, the complaint alone sets forth the factual allegations that inform our review of this motion to dismiss.

In his complaint, Mihos explains that Swift stated in the February 6, 2002 termination letters that she removed Mihos and Levy from office principally because their votes were "fiscally irresponsible." However, Mihos's complaint then denies this charge, stating that the motion for which he voted "was fiscally sound and in the best interest of the Authority." Furthermore, Mihos alleged that "he exercised his best judgment and concluded that the January 2002 toll increase was not in the Authority's best interests and was not necessary as a matter of law." According to Mihos's complaint, "Swift was enraged that the Authority failed to

-31-

approve the January 2002 toll increase, which she supported." Further, Mihos alleged that the actions Swift took against him "were in direct retaliation for the votes" he took regarding the tolls. Finally, Mihos alleged that he was "removed from public office before the expiration of his term because of disagreement with the way [he] voted on matters of public concern" and that his termination was "political interference and intimidation." The district court, and this court on appeal, must accept Mihos's version of the dispute. Accordingly, when considering only the complaint, as we are bound to do, we find a void on Swift's side of the scale and the Pickering scale tips decisively in favor of Mihos.

### c. Substantial Factor

Having determined that the Pickering balance favors Mihos's First Amendment rights, we now consider whether his vote was a substantial factor in Swift's decision to fire him. See Mt. Healthy City School Dist. Bd. Educ. v. Doyle, 429 U.S. 274, 287 (1977). This "substantial factor" requirement is wholly distinct from the discussion of "motivation" in the previous section.[14]

---

[14]Many of the qualified immunity cases use the phrases "substantial factor" and "motivating factor" interchangeably to describe the causal relationship between the protected conduct and the adverse action taken against the plaintiff. We prefer to use the phrase "substantial factor" to avoid confusion with the earlier discussion of motivation, where motivation, rather than referring to causation, refers to whether Swift was concerned about legitimate government interests or impermissible retaliation. See Stella, 63 F.3d at 74-75 (explaining that "plaintiff must show . .

Here, the inquiry is whether Mihos's termination was attributable to his exercise of his First Amendment rights or to some other reason unrelated to his vote. See id. In short, the issue is the causal link between the protected conduct and the adverse employment action. For purposes of her motion to dismiss, Swift did not contest that Mihos's vote was the reason for her decision to remove him from the Turnpike Authority. Again, we pause briefly to address this issue on the merits.

Mihos and Levy voted against Swift's wishes regarding the toll increases on October 30, 2001. Seventeen days later, on November 16, Swift informed Mihos and Levy that she was removing them from office. Following Levy I and the termination hearing, Swift notified Mihos and Levy of her decision to remove them for cause, stating that the principal cause for their removal was their "fiscally irresponsible" votes on October 30, 2001. The third member of the Turnpike Authority, who proposed the January 2002 increases and voted against the July 2002 toll increases, never received any such communication. Hence, we agree with the district court that, on these facts, there is no serious dispute that

---

. that his speech was a substantial or motivating factor for the adverse action taken against him . . . and the defendant must then prove . . . that the employer would have acted in the same way toward the plaintiff 'even in the absence of the protected conduct.'"(citing Mt. Healthy, 429 U.S. at 287)(internal citations omitted)).

Mihos's vote on the timing of the toll increases was a substantial factor in Swift's decision to remove him from office.

Having determined that (1) Mihos's vote involved a matter of public concern, (2) Mihos's and the public's interest are more weighty on the Pickering scale than Swift's, and (3) Mihos's vote was a substantial factor in Swift's decision to fire him, we conclude that Mihos has alleged a violation of his First Amendment rights.

### 2. Clearly Established Right

We now turn to whether Mihos's First Amendment right in this case was clearly established at the time Swift decided to remove him from the Turnpike Authority.

The level of abstractness at which the "right" in question is articulated can often determine the outcome of this inquiry. In consequence, the Supreme Court has cautioned against applying general definitions of constitutional rights in the qualified immunity context. Anderson v. Creighton, 483 U.S. 635, 639 (1987). "The inquiry into the nature of a constitutional right for the purpose of ascertaining clear establishment seeks to discover whether the right was reasonably well settled at the time of the challenged conduct. . . ." Martinez v. Colon, 54 F.3d 980, 988 (1st Cir. 1995). Additionally, the "inquiry into whether the right is clearly established 'must be undertaken in light of the

specific context of the case, not as a broad general proposition.'" Suboh, 298 F.3d at 93.

With this guidance in mind, we articulate the First Amendment right at stake here as the right of a public official to vote on a matter of public concern properly before his agency without suffering retaliation from the appointing authority for reasons unrelated to legitimate governmental interests. We have applied a similar formulation before: "[a]lthough we have found no cases directly on point, probably because it is considered unassailable, we have no difficulty finding that the act of voting on public issues by a member of a public agency or board comes within the freedom of speech guarantee of the first amendment. . . . There can be no more definite expression of opinion than by voting on a controversial public issue." Miller v. Town of Hull, 878 F.2d 523, 532 (1st Cir. 1989). We reiterated six years later that this right was clearly established:  "Voting by members of . . . boards, commissions, and authorities comes within the heartland of First Amendment doctrine, and the status of public officials' votes as constitutionally protected speech [is] established beyond peradventure of doubt. . . ." Stella v. Kelley, 63 F.3d 71, 75 (1st Cir. 1995).

Notwithstanding Stella and Miller, Swift urges that "a balancing test, by its indeterminate nature, makes it highly unlikely that a public employer, in such circumstances, could be

held to have violated a clearly established right."  In support of this proposition, Swift refers to Frazier v. Bailey, quoted by the district court in Mihos II, holding that when a right is "subject to a balancing test, the right can rarely be considered 'clearly established,' at least in the absence of closely corresponding factual and legal precedent." 957 F.2d 920, 931 (1st Cir. 1992). Here, though, Miller and Stella provide the "closely corresponding factual and legal precedents" that would have served to inform a public official that Mihos's First Amendment right was clearly established.[15]

As Swift acknowledges in her brief, both cases involve votes by public officials on matters of public concern and their subsequent removal based on those votes.  Swift seeks to downplay their import by emphasizing that Miller and Stella neither applied the Pickering balancing test nor addressed "the limits of the 'right to vote' where the removing official states that the consequences of the decision rendered by the 'vote' will harm the public interest."

Once again, Swift is hampered by the procedural posture of this case.  Her stated belief that the consequences of Mihos's vote will harm the public interest cannot trump Mihos's claim of a

---

[15]Whether a reasonable person in Swift's position would have known that her actions violated that clearly established right is a different question.  We address that question in the next section.

politically retaliatory motive. As we have explained at length, on a motion to dismiss the factual allegations in the complaint control. Hence, Swift's defense of her action cannot serve to distinguish Stella and Miller any more than it can weigh on her side of the Pickering scale.

### 3. The Understanding of a Reasonable Official

The third step in the qualified immunity analysis, which embodies the objective standard announced in Harlow, requires us to analyze "whether an objectively reasonable officer in the defendant's position would have understood [her] action to violate the plaintiff's rights." Suboh, 298 F.3d 95. Given the facts alleged in the complaint, as described in Part I.A. supra, we have no trouble finding that a reasonable official similarly situated to Swift would have known that terminating Mihos for his vote violated his constitutional rights. Taking the allegations in the complaint as true, Mihos exercised his best judgment as to the proper course of action, cast his vote, and was fired in retaliation for that vote for reasons unrelated to legitimate governmental interests. No reasonable public official could have failed to realize that a member of a public instrumentality cannot be terminated on such grounds for voting on matters of public concern within his authority.

Having found that (1) Mihos's allegations, if true, establish a violation of his First Amendment rights, (2) the right

was clearly established at the time Swift fired him, and (3) a reasonable public official would have known that the discharge constituted a constitutional violation, we find that Swift is not entitled to qualified immunity.[16]

III.

For the reasons explained above, we affirm the district court's denial of the motion to dismiss in Mihos I, vacate the declaratory judgment and the denial of damages in Mihos II, and remand for proceedings consistent with this opinion.

SO ORDERED.

---

[16]Of course, this ruling does not preclude Swift from asserting qualified immunity in a subsequent motion for summary judgment or at trial. See Guzman-Rivera v. Rivera-Cruz 98 F.3d 664, 669 (1st Cir. 1996)(holding that the "defense of qualified immunity may be raised and appealed at multiple stages of the trial. . . ."). However, if the trial court denies the request for summary judgment because of a genuine issue as to any material fact, including motive, that ruling would not permit an interlocutory appeal. See, e.g., Stella, 63 F.3d at 74 (holding that "a district court's pre-trial rejection of a qualified immunity defense is not immediately appealable to the extent that it turns on either an issue of fact or an issue perceived by the trial court to be an issue of fact.").