Maria **ALDARONDO–LUGO,**
et al., Plaintiffs

v.

**MUNICIPALITY OF TOA BAJA,**
et al., Defendants

No. CIV. 02–1123(JP).

United States District Court,
D. Puerto Rico.

Aug. 2, 2004.

Andrés Guillemard–Noble, Esq., Nachman & Guillemard, San Juan, PR, for Plaintiff.

Jorge Martínez–Luciano, Pedro Ortiz Alvarez Law Offices, Ponce, PR, Juan R. González–Muñoz, Vanessa Vicéns, González Muñoz Law Office, San Juan, PR, Michael C. McCall, Esq., Michael Craig McCall Law Office, San Juan, PR, for Defendants.

## OPINION AND ORDER

PIERAS, Senior District Judge.

### I. INTRODUCTION

The Court has before it Defendants' "Motion Requesting the Court to Grant Summary Judgment Dismissing the Due Process Claims, Find that the Individual Defendants are Entitled to Qualified Immunity and Dismiss the Claim for Punitive Damages Against the Municipality and the Official Capacity Defendants" (Ds' MSJ") (docket ·No. 64).[1] Defendants (i) the current Mayor of the Municipality of Toa Baja—Mr. Víctor Santiago–Díaz (the "New Mayor"), (ii) the former head of the human resources department of the Municipality of Toa Baja—Ms. Milagros Delgado ("Ms.Delgado"), and (iii) the Municipality of Toa Baja itself (the "Municipality"), request (1) the grant of summary judgment for the dismissal of the due process claims, (2) the dismissal of the punitive damages claims against the New Mayor and Ms. Delgado, both in their official capacity, and against the Municipality, and (3) a finding that the New Mayor and Ms. Delgado, both in their personal capacity, are entitled to qualified immunity.

Plaintiffs, ninety-five (95)[2] employees and former employees of the Municipality, have agreed to the dismissal of the due process claims with prejudice and have

1. This is the first in a series of six motions. The others are (1) "Plaintiffs' Opposition to Defendants' Motion for Summary Judgment" (docket No. 70), (2) "Reply by Defendants Municipality of Toa Baja, Hon. Víctor J. Santiago and Milagros Delgado in Their Official Capacity" (docket No. 75), (3) "Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment and Plaintiffs' Statement of Uncontested Facts" (docket No. 79),(4) "Plaintiffs' Sur–Reply to Official Capacity Defendants' Reply" (docket No. 86)

and (5) "Plaintiffs' Sur–Reply to Defendants' Reply" (docket No. 89).

2. There used to be ninety-eight Plaintiffs, but three of them requested the voluntary dismissal of their claims (see dockets number 53 and 57). They have been divided into the following six distinct categories based on the nature of the alleged adverse employment action: (1) career employees whose positions were annulled and were subsequently relocated to inferior positions,(2) career employees

clarified that the punitive damages claim is solely against the New Mayor and Ms. Delgado, in their personal capacity.[3] The only matter before the Court at this time is the qualified immunity defense from liability under 42 U.S.C. § 1983 for adverse employment actions taken against Plaintiffs due to their New Progressive Party ("NPP") political affiliation, in violation of their free speech under the First Amendment. Plaintiffs' claims arise from a process of re-classification undertaken by the New Mayor upon assuming office. The New Mayor and Ms. Delgado are members of the Popular Democratic Party ("PDP"). The Court will only discuss the First Amendment claims of all Plaintiffs except for those who allege only harassment.

The Court hereby **GRANTS** Defendants' requests (docket No. 64) and (i) **DISMISSES** the due process claims against all Defendants, (ii) **DISMISSES** the punitive damages claims of all Plaintiffs, other than those Plaintiffs who allegedly suffered only harassment, against all Defendants, **WITH PREJUDICE**, and (iii) **FINDS** that Defendants, in their personal capacity, are entitled to the qualified immunity defense against the First Amendment claims, other than those of Plaintiffs who allegedly suffered only harassment, and therefore **DISMISSES** the First Amendment claims (other than those of Plaintiffs who allegedly suffered only harassment) against the New Mayor and Ms. Delgado, in their personal capacity, **WITH PREJUDICE**.

## II. FINDINGS OF FACT

The following facts were stipulated by the parties during the ISC of June 25, 2002:

whose positions were annulled and were subsequently reclassified as temporary employees, (3) career employees who have been harassed, (4) career employees whose positions were annulled and were subsequently termi-

1. On November 7, 2000, general elections were held in Puerto Rico. The New Mayor, the PDP candidate for mayor of the Municipality, defeated Mr. Víctor Soto, the NPP candidate.

2. At the time of his defeat, Mr. Soto had been mayor of the Municipality for 16 years (1985–2001).

3. The NPP had held control of the Municipality for 24 years.

4. The New Mayor assumed office in January 2001.

5. The Municipality is a unit of local government pursuant to Act. No 81 of August 30, 1991, known as the Law of Autonomous Municipalities of Puerto Rico, as amended, 21 P.R. Laws Ann. §§ 4001–4008 ("Act No. 81"), and has legal capacity to sue and be sued.

6. All Plaintiffs worked as employees of the Municipality during Mr. Soto's tenure as mayor.

7. The Comptroller of Puerto Rico performed an audit of the Municipality and submitted a report of his findings—Audit Report M–00–40, for the period covering January 1, 1996 through December 31, 1998, but "in some aspects, operations of prior and subsequent dates were examined" (the "Audit Report") [page 3 of Exhibit B of Defendants' Summary of Undisputed Material Facts ("Ds' SUMF")].

The Court has made the following findings of fact based on the record:

1. In the Audit Report, the Comptroller summarized the situation as a "con-

nated, (5) career employees whose salaries were reduced, and (6) transitory employees who were denied re-employment.

3. See dockets number 7 and 86.

stant pattern of irregular behavior in relation to the administrative and fiscal procedures of th[e] Municipality" [page 3 of Exhibit B to Ds' SUMF].

2. The Municipality adopted a Classification and Retribution Plan for the Career and Trust Services that dated from July 1991 (the "1991 Plan") [Exhibit 1 of Plaintiffs' Opposition ("Ps' Opp")]. Such plan was adopted pursuant to the Personnel Public Service Act, Act No. 5 of October 14, 1975 [See paragraph 4 below].

3. The Municipality adopted certain amendments to the 1991 Plan in 1993.

4. On July 27, 1993, Mr. Oscar Ramos Meléndez, former director of the Central Office of Personnel Administration ("OCAP"), sent a letter to the former mayor of the Municipality, Mr. Víctor Soto Santiago [Exhibit N to Ds' SUMF].

5. In 1997, the Municipality made certain changes to the classifications and salaries of municipal employees (the "1997 Changes"). The document was entitled "Amendments to the Classification and Retribution Plan of 1991" and was ultimately approved as Ordinance No. 8 on July 29, 1997 [page 3 of Ps' Opp; page 6 of Ds' SUMF].[4]

6. The 1997 Changes had not been submitted to the Central Office of Work Assistance and Human Resources Administration ("OCALARH") for approval.

7. On December 11, 1997, the former director of OCALARH—Aurea González–Ríos, sent a letter to Ms. Hilda E. Acevedo

Caraballo—former President of the Municipality's Municipal Assembly [Exhibit O to Ds' SUMF].

8. Ms. María Sánchez Corraliza, an employee of the Municipality's Human Resources Department, met with the New Mayor in January and February of 2001 (page 4 of Ps' Opp.).

9. On February 8, 2001, Mr. Angel T. Aguiar Leguillou, OCALARAH Acting Director, sent a letter to the New Mayor [Exhibit W of D's SUMF].

10. On March 30, 2001, Ms. Bárbara M. Sanfiorenzo Zaragoza from the Office of the Commissioner of Municipal Affairs ("OCAM"), sent a letter to Ms. Delgado [Exhibit P of Ds' SUMF].

11. On May 29, 2001, Ms. Emmalind García–García, OCALARH administrator, sent a letter to the New Mayor [Exhibit R of Ds' SUMF].

12. On November 28, 2001, Ms. García–García, sent a second letter to the New Mayor [Exhibit 6 of Ps' Opp.].

## III. LEGAL FRAMEWORK

### A. Background—Political Discrimination under the First Amendment

In order to succeed in a political discrimination action, plaintiffs must show (1) that their jobs enjoy protection against political patronage (that they do not hold policymaking positions or positions of unusual confidence),[5] and (2) that political

---

**4.** According to Plaintiffs, the 1991 Plan "required certain alterations and/or modifications to better address, among other things, changes in the federal minimum wage and the varying nature of several positions." [page 3 of Ps' Opp.]. The Municipality's former mayor refers to the 1997 changes as the "1997 Career Classification Plan" and stated that such changes "had the effect of eliminating and/or adding classifications and posi-

tions as well as raising the salary scales and the classifications" [¶ 5 of Exhibit A of Ds' SUMF].

**5.** We do not need to analyze this element because Defendants have not claimed that political affiliation was an appropriate criterion for making decisions vis-à-vis those jobs. Their contention hinges upon clause (2).

affiliation was a substantial or motivating factor in Defendants' decision to take adverse employment action against them. If plaintiffs satisfy the burden described in clause (2) above, then, defendants must prove that they would have taken the same action regardless of the plaintiffs' political affiliation. *Gómez v. Rivera Rodríguez*, 344 F.3d 103, 110 (1st Cir.2003) (citations omitted). It is important to stress that motivation or intent is an essential element under this cause of action. *Acevedo-García v. Vera-Monroig*, 204 F.3d 1,11 (1st Cir.2000).

### B. *Qualified Immunity Inquiry*

The qualified immunity doctrine protects civil servants from suit and liability arising from the performance of their duties "insofar as their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known." *Mihos v. Swift*, 358 F.3d 91, 101 (1st Cir.2004) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); see also *Mitchell v. Forsyth*, 472 U.S. 511, 525–27, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); and *Acevedo-García*, 204 F.3d at 10. The judge-made test to determine if a public official is entitled to qualified immunity is comprised of three parts: "(1) whether plaintiff's allegations, if true, establish a constitutional violation; (2) whether the constitutional right at issue was clearly established at the time of the putative violation; and (3) whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to

contravene the discerned constitutional right." *Limone v. Condon*, 372 F.3d 39, 44 (1st Cir.2004) (citations omitted); see also *Mihos*, 358 F.3d at 102.

The first part of the test is used to determine whether the plaintiff can establish that a particular defendant violated its constitutional rights. *Febus-Rodríguez v. Betancourt-Lebrón*, 14 F.3d 87, 91 (1st Cir.1994). The Court's opinion will focus on the first part. The second part [6] is designed to determine whether the defendant had fair warning that his or her conduct was unconstitutional. *Limone*, 372 F.3d at 45 (citation omitted). The third part introduces the parameter of a reasonable person in order to eliminate, but solely from this third part of the test,[7] the inquiry into the public official's subjective state of mind. *Mihos*, 358 F.3d at 104.

Movants and plaintiffs opposing a qualified immunity defense alike must understand that "the motivation element of the constitutional claim does not disappear at the qualified immunity stage." *Acevedo-García*, 204 F.3d at 12. As a matter of fact, motive has been the bloody battlefield in many a political discrimination case. This Court has repeatedly denied qualified immunity defenses raised in motions for summary judgment because it has found factual disputes with respect to motive. Such is not the case in this instance.

### C. *Qualified Immunity Within A Motion for Summary Judgment*

Defendants have raised the qualified immunity defense in a motion for summary

---

**6.** Regardless of Defendants' arguments, it is clearly established that non-policymaking public employees are constitutionally protected from adverse employment decisions on account of their political affiliation. *Gómez-Candelaria*, 344 F.3d at 109 (citations omitted).

**7.** Many defendants, like the ones in this case, understood *Harlow* to mean that "[e]vidence

concerning the defendants' subjective intent is no longer relevant or part of the qualified immunity defense." [page 30 of Defendants' MSJ]. They are wrong. The inquiry into motive has become the central issue in the qualified immunity analysis. *See Crawford-El v. Britton*, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759(1998).

judgment. A motion for summary judgment must be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In particular, the First Circuit has stated that "[t]he nonmovant cannot simply rest upon mere allegations ... Instead, the nonmoving party must adduce specific, provable facts which establish that there is a triable issue." *Febus–Rodríguez,* 14 F.3d at 90 (citing *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990)).

There would appear to be a conflict between the qualified immunity defense and the summary judgment standard. On the one hand, the Supreme Court has instructed courts to start the qualified immunity analysis with "the question of whether the facts *as alleged* make out a violation of the First Amendment." *Dirrane v. Brookline Police Dept.,* 315 F.3d 65, 69 (1st Cir.2002) (*citing Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)) (emphasis in original); *see also Mihos,* 358 F.3d at 102. Courts have interpreted this to mean that they must analyze a plaintiff's allegations as set forth in the complaint. *Mihos,* 358 F.3d at 99 (citation omitted). On the other hand, a court deciding on a motion for summary judgment is expected to look at the whole record. Fed.R.Civ.P. 56(c).

We understand that the courts have adopted a syncretic approach to analyzing the qualified immunity defense presented in a motion for summary judgment. Such an analysis takes into account the spirit of the qualified immunity doctrine and the consequences associated with a summary judgment. As a result, the Court must look at "the record," particularly with respect to a defendant's acts, and "determine whether a genuine issue does or does not exist concerning qualified immunity." *Febus–Rodríguez,* 14 F.3d at 90. In other words, the Court must "determine whether ... [P]laintiffs have introduced sufficient evidence to create a genuine issue of material fact that [Defendants] violated [Plaintiffs'] constitutional rights, and if so, whether [Defendants] are otherwise entitled to qualified immunity." *Id.* at 91 (*emphasis ours*). This approach must be undertaken within the constraints imposed by the evaluation of a motion for summary judgment, where "the court must review the facts in the light most favorable to the plaintiff." *Id.* at 89.

### D. Qualified Immunity v. The Merits

The Court would like to stress that it is aware that the qualified immunity inquiry is "separate and distinct" from the inquiry into the merits. *Camilo–Robles v. Hoyos,* 151 F.3d 1,7 (1st Cir.1998). Our analysis in this case will be akin to what the Court did in *Amsden v. Moran,* 904 F.2d 748, 753–58 (1st Cir.1990), where it examined the substance of the plaintiff's due process claims to determine the defendants' eligibility for qualified immunity. In our case, we will examine the substance of Plaintiffs' First Amendment claims, as supported by the record, to determine the New Mayor's and Ms. Delgado's eligibility for qualified immunity.

## IV. ANALYSIS AND CONCLUSIONS OF LAW

### A. Introduction

Time and time again, changes in political administration in Puerto Rico are preceded by the following:

[T]he outgoing party attempts to secure the continued tenure of its members in public jobs through a variety of devices, such as reclassifying policy-type appointments as career positions or making appointments in violation of Puerto Rico law." *Sánchez–López v. Fuentes–Pujols,* 375 F.3d 121, 124 (1st Cir.2004).

Defendants have described one of those times. They have narrated the story of a losing incumbent's attempts to protect his kind. This description is buttressed by the record.[8] Such situation, however, is not enough to dispose of the qualified immunity issue in this case. The First Circuit has repeatedly stated that plaintiffs are entitled to First Amendment rights regardless of the invalidity of the plan used for their original classification (*see Santiago Negrón v. Castro–Dávila,* 865 F.2d 431 (1st Cir.1989), and *Kauffman v. PRTC,* 841 F.2d 1169 (1st Cir.1988)). The Court is focusing on the steps taken by Defendants upon assuming power and Plaintiffs' ability to support political animus as the motivation driving Defendants' actions. In particular, the Court will analyze, as part of the first prong of the qualified immunity test, whether Plaintiffs were able to create a triable issue of fact around Defendants' motivation. The Court will be in the search for evidence of political discrimination.

**B. Discoveries by the New Mayor; Steps Taken**

### Discoveries by the New Mayor

The New Mayor encountered a municipality with a deficit of sixteen million dollars ($16 million), outstanding debt to suppliers of eleven million dollars ($11 million) and debt to the government of Puerto Rico in the amount of fifty-three million dollars

($53 million) [¶ 3 of Exhibit A to Ds' SUMF]. The Comptroller summarized the situation as a "constant pattern of irregular behavior in relation to the administrative and fiscal procedures of th[e] Municipality" [page 3 of Exhibit B to Ds' SUMF].

In the human resources front, Defendants reviewed the Transition Committee Report prepared by the departing Municipality's administration [¶ 3 of Exhibit I to Ds' SUMF] and the Comptroller's Audit Report,[9] among other things, to conclude that "hundreds of employees ... had been illegally appointed to their employment positions and/or ... were granted illegal salary raises and promotions in violation of the merit principle" [¶ 4 of Exhibit A to Ds' SUMF; page 2 of Ds' SUMF]. Defendants were faced with the 1991 Plan and the 1997 Changes. The 1991 Plan had been approved by OCALARH. The 1997 Changes had not been submitted to OCALARH for approval.

To summarize, when the PDP administration took office in January of 2001, it inherited what could be described as a badly administered NPP fiefdom.[10]

### Steps Taken

The new administration embarked on a Corrective Action Plan to address the Comptroller's findings [¶ 6 of Exhibit A to Ds' SUMF]. As part of the plan, the new administration consulted with OCALARH

---

8. The Court has made these findings of fact based on Ds' SUMF. Plaintiffs have not opposed them, so the Court deems them as true for purposes of this motion (as permitted by Local Rule 56(e) of the United States District Court for the District of Puerto Rico).

9. In the Comptroller's summary of findings, he included multiple irregularities associated with hiring practices, including the following: (a) from February 1985 to October 1997, Mr. Soto appointed as employees 33 persons that were either his relatives or relatives of municipal legislators, 21 of which did not have the

minimum requirements demanded of their positions and (b) from July 1993 to February 1997, Mr. Soto approved 19 reclassifications of positions and granted three salary increases to other 12 officers and four (4) employees that exceeded the maximum retribution set forth in the classification and retribution plans [pages 3–4 of Exhibit B to D's SUMF].

10. The PNP had held the Municipality's reins for 24 years, and Mr. Soto had been the mayor for sixteen (16) of those 24 years.

and OCAM. At that time, these government agencies were unanimous in their view: the 1997 Changes were null and void because they hadn't been approved by OCALARH [page 3 of Exhibit P, page 1 of Exhibit W, and page 5 of Exhibit R, all to Ds' SUMF], and the employees had to be placed within the framework of the 1991 Plan [pages 2–3 of Exhibit I and pages 3–4 of Exhibit A, both of Ds' SUMF].

The Municipality undertook its review of all employee personnel files [pages 3–4 of Exhibit A and page 4 of Exhibit I, both of Ds' SUMF]. Once the results were available, the New Mayor sent letters to all employees who could be affected by personnel transactions. In such letter, the employees were apprised of their right to a hearing before an Independent Hearing Examiner ("IHE"). A hearing was held for those employees who requested it. The IHE issued his or her own reports. A second letter was sent to those employees who had requested a hearing informing them of the IHE's recommendation. If the IHE was in agreement with the Municipality's initial determination with respect to an employee, such employee was informed of the effective date of the change in his or her status, position and salary. These employees were also informed of their right to seek a review from the Board of Appeals of Personnel Administration [see pages 4–5 of Exhibit A of Ds' SUMF].

### C. Plaintiffs' Position and Support Therefor

Plaintiffs are of the position that the Comptrollers' findings were used as an excuse to undertake personnel actions [11] against them in violation of their First Amendment rights [page 5 of Ps' Opp.].

The point of departure for their argument is the 1997 Changes. These were used to appoint Plaintiffs to their original positions. Plaintiffs support a characterization of the 1997 Changes as amendments to the 1991 Plan, as opposed to a new plan for the following reason. Under Article 11.028 of Act No. 81, employee classification and retribution plans must be approved by OCALARH. However, mere plan amendments do not need to be approved by such office. The 1997 Changes were not approved by OCALARH simply because approval was not required. According to Plaintiffs, Defendants knew that the 1997 Changes were amendments and should have therefore kept Plaintiffs in their positions as set forth in the 1997 Changes.

Plaintiffs say that in spite of Defendants having had such knowledge (of the true nature of the 1997 Changes), they actively supported a characterization of the 1997 Changes as a new plan. Defendants used the lack of approval of the 1997 Changes by OCALARH as an excuse to annul Plaintiffs' appointments under the 1997 Changes and re-classify them under the 1991 Plan. But Plaintiffs go further. They believe that Defendants were actually responsible for duping the governmental offices into characterizing the 1997 Changes as a new plan in order to throw the 1997 Changes out the window and facilitate the re-classification of Plaintiffs under the 1991 Plan. This is why Plaintiffs boldly state that "the crux of the case is essentially whether the measures taken in 1997 by the Toa Baja Municipal Assembly . . . constituted a new classification and retribution plan, or merely amendments to the existing plan" [page 7 of Ps' Opp.].

To support their claims, Plaintiffs' presented a Statement of Contested Facts

---

11. As previously stated, the Court is aware that a group of Plaintiffs does not neatly fall within a re-classification category (those that

were only harassed). The Court's analysis **does not** cover the qualified immunity defense against their First Amendment claims.

that can be divided into three major groups: (1) political discrimination claims that are backed solely by the Amended Complaint,[12] (2) statements that are truly uncontested because they were stipulated by the parties or were basically equivalent to paragraphs from Ds' SUMF,[13] and (3) facts that are supported by the record and will be addressed by the Court below.[14] The Court has gone through the record to identify the contested facts, if any, and then determine whether they create a triable issue with respect to motivation, which is a material element in this case.

The Court begins with the first prong of the qualified immunity test: whether Plaintiffs can establish that a particular defendant violated their constitutional rights. In order to succeed in defeating the arguments and evidence raised by Defendants, Plaintiffs must create an issue of fact with respect to Defendants' motivation-whether political affiliation was a substantial or motivating factor in Defendants' decision to take adverse employment action against them.[15]

Plaintiffs have presented the following *four arguments:*

1. **Defendants Induced Government Agencies into Characterizing the 1997 Changes as a Plan, as Opposed to an Amendment.**

Plaintiffs understand that Defendants duped the governmental agencies into characterizing the 1997 Changes as a new plan in order to throw the 1997 Changes out the window and facilitate the re-classification of Plaintiffs under the 1991 Plan.

Plaintiffs use various sources to support their characterization of the 1997 Changes. First, they highlight what is not said in the Audit Report. The Comptroller does not state in his report that the 1997 amendments are null and void [page 4 of Ps' Opp.]. We will not spend much time in considering such argument. It is the Comptroller's obligation to "audit all the revenues, accounts and expenditures of the ... municipalities, in order to determine whether they have been made in accordance with law" (P.R. Const. § 22). In this case, the Comptroller informed the Municipality that it was in non-compliance with a plethora of laws and regulations, including Article 11.029 of Act No. 81, the one that lists municipalities' obligations with respect to municipal employee plans. The Comptroller was not obligated under the law to provide a legal opinion on the validity of the Municipality's documents, so we will not interpret such omission as support for the contention that the 1997 Changes constituted, or that the Municipality should have known that the 1997 Changes constituted, an amendment, and acted otherwise, and such actions show political intent.

---

12. Examples of the first group are paragraphs number 1 and 13, where Plaintiffs summarize their case, and paragraph number 2, where Plaintiffs mention the word discrimination.

13. Examples of the second group are (i) facts on the nature of the 1991 Plan and 1997 Changes (see paragraphs 3–4), (ii) facts on the Comptroller's report (paragraph 5), (iii) facts on the election of the New Mayor (paragraph 6), (iv) facts on the informal hearings (paragraph 11).

14. Examples of the third group include (i) facts on conversations between the New Mayor and Ms. María Sánchez Corraliza (see paragraphs 7 and 8), (ii) facts on letters from OCAP and OCALARH (paragraphs 9–10, and 12) and (iii) an example of possible Municipality incompetence (see paragraph 22).

15. For purposes of this opinion, we will assume that the employees have all suffered an adverse employment action, even though this assumption is not evident from the record (see docket No. 49).

The Court would also like to add that the Comptroller was named by the NPP former governor of Puerto Rico prior to his loss in the 2000 general elections (to the PDP). In other words, the Comptroller was named by the same political party as the former mayor of the Municipality. And still the Comptroller criticized the situation so adamantly.

Second, Plaintiffs bring forth the statements of Ms. María Sánchez Corraliza, an employee of the Municipality's Human Resources Department. Ms. Sánchez Corraliza met with the New Mayor in January and February of 2001, and informed him that based on (1) her involvement in the preparation of the 1997 Changes, (2) her conversations during 1997 with Mr. Alex Mercado, former Director of OCALARH's Technical Area, and (3) the fact that the 1997 Changes had been approved through Municipal Ordinance (and that municipal ordinances had the force of law), the 1997 Changes were indeed an amendment [pages 4–5 of Ps' Opp.].

Plaintiffs would have us interpret the Municipality's apparent disregard of Ms. Sánchez Corraliza's statements as evidence that the 1997 Changes constituted, or that the Municipality should have known that the 1997 Changes constituted, an amendment, and acted otherwise, and such actions show political intent. Ms. Sánchez Corraliza is not an attorney and she is not a disinterested party in this matter. Her statements must be put into the correct context, even if she was, as she alleges in her deposition, asked by God to enlighten the New Mayor [page 183 of Exhibit FF]. In addition, and more importantly, Defendants have demonstrated that various government agencies disagreed with the characterization of the 1997 Changes even prior to 2001. This will be further discussed below.

The Court will not take the gargantuan leap of faith requested by Plaintiffs with respect to these declarations. Her statement in and of itself makes many assumptions that are not supported by the record: (1) for one thing, that her statement added anything to what Defendants already knew, (2) that there is only one way to attack a municipal ordinance, and (3) that not following a particular employee's advice equals political discrimination. Ms. Sánchez Corraliza's statements go to what Plaintiffs once characterized as "the crux of the matter"—the nature of the 1997 Changes. The problem is that the Court does not accept that the validity or lack of validity of the 1997 Changes is "the crux of the matter." The crux of the matter in this First Amendment case is whether Defendants acted with political animus. Ms. Sánchez Corraliza does not throw much light, if any, on that.

Even though the validity or lack thereof of the 1997 Changes is not the crux of the matter, so to speak, Ms. Sánchez Corraliza's statement does bring forth an important issue: OCALARH appears to have contradicted itself with respect to the nature of the 1997 Changes. Ms. Sánchez Corraliza mentions that in 1997, based on a conversation she had that year with the agency, OCALARH regarded the 1997 Changes as amendments. In the letter dated November 28, 2001, OCALARH summarized the applicable law with respect to plan amendments (they don't have to be submitted for OCALARH's consideration) and expressed its view of municipal ordinances ("We understand that the ordinances that are approved by the Municipal Legislatures have the force of law. We consider that we do not have the legal authority to vacate [the] same."). Even though there is no mention of the 1997 Changes as such, the 1997 Changes were adopted by municipal ordinance. OCALARH seems to be stating that its hands are tied.

Such position appears inapposite to the following two letters by the agency: (i) in the letter dated February 8, 2001, OCA-LARH sets forth the applicable law with respect to amendments and mentions the 1991 Plan as the one approved by his office [page 3], and (ii) in the letter dated May 29, 2001, OCALARH stated: "It is our understanding that by not being approved by this Office, the plans of 1997 are not valid." OCAM joined the bandwagon with its letter of March 30, 2001, where it stated that "[t]he Plan created by your municipality in 1997 has no validity". The Court would like to state that this position, that the 1997 Changes were indeed a new plan, was the one supported by the previous central administration, which was of the same political party as the former mayor of the Municipality: NPP.[16]

Third, Plaintiffs reference the IHE's report and recommendations issued subsequent to Plaintiffs' hearings. The IHE suggested that the Municipality ask the courts to determine whether the 1997 Changes are valid or not. Plaintiffs neglected to reference other statements from the same page of the IHE's report. For instance, they neglected to mention that the IHE's suggestion to seek a judicial resolution was to provide the Municipality "with certainty of what was already stated [by the IHE in the report]." In addition, the IHE report stated as follows: "[I]t is our opinion that the 1997 Plan is null for failure to comply with the provisions of Art. 11.029 of Act No. 81." Finally, the IHE stated that in the meantime, the employees' status should be "reverted" to one under the 1991 Plan, which is exactly what the Municipality did.

Once again, Plaintiffs were asking the Court to interpret the Municipality's choice not to immediately seek judicial res-

olution (proposed by the IHE as a way to obtain peace of mind), as evidence that the 1997 Changes constituted, or that the Municipality should have known that the 1997 Changes constituted, an amendment, and acted otherwise, and that such actions show political intent. The truth is, it is not clear whether the 1997 Changes constitute an amendment or a new plan. However, the Court believes that such determination is unnecessary for purposes of this case. The important element in this case is to determine if whether from the actions taken by Defendants, as supported by evidence presented by the Plaintiffs, one could infer that political animus was their motivation.

As an afterthought, the Court would like to add that the "inducement" argument can only have substance in this case if either the Municipality did not know that it had to submit the 1997 Changes to OCA-LARH or the agencies issuing the opinions *did not* receive the actual document. There is evidence to the contrary on both accounts. In a letter dated July 27, 1993, OCAP (former name for OCALARH) specified to the previous Municipality administration that "it is not appropriate to incorporate amendments to the plans that were approved when the Municipalities still operated as individual administrators", in other words, plans approved prior to Act No. 81. The 1991 Plan predates Act No. 81. Therefore, the former administration knew that OCALARH was of the position that any changes made after Act No. 81 (which would include the 1997 Changes) would have to be approved by such agency.

In the letter by OCALARH dated December 11, 1997, the agency mentions having received the amendments. The agency also states: "We understand that the documentation submitted by this Municipality

---

**16.** The NPP political party was the party in power at the Commonwealth ("central") level from 1992 through 2000. In 2000, the PDP

won the elections at the Commonwealth level as well as the ones at the Municipality.

is a new Position Classification and Remuneration Plan by the Municipal Assembly, and as such it requires evaluation and approval from this office". Therefore, any responsibility that Defendants could have had for an alleged "inducement" with respect to the document is trumped by the agencies' statements and the agencies' receipt of the 1997 Changes. The Court would like to stress that both letters were issued by the NPP Commonwealth government to an NPP Municipality.

Finally, even if the office had not received a copy of the 1997 Changes in 2001, correspondence between the Municipality and OCALARH related to obtaining a legal opinion on the 1997 Changes from such office. If the office provided legal opinions on the 1997 Changes without the benefit of reading the document, *which we seriously doubt,* OCALARH is seriously incompetent. Plaintiffs cannot pretend to hold Defendants' liable under § 1983 for a governmental agency's incompetence in the undertaking of its statutory responsibilities.

Plaintiffs have reiterated that Defendants "induced the governmental agencies into error by referring to [the 1997 Changes as] the 1997 Plan rather than the 1997 Amendments". The Court disagrees. What the evidence shows is, at best, different interpretations of the legal nature of a document and different ideas as to the best legal strategy to adopt in a difficult situation, and, at worse, possible incompetence by employees of government agencies. The evidence presented by Plaintiffs to support a finding of political motivation does not arise to the level of Defendants' evidence to support a lack thereof.

### 2. Co-defendant Mayor Santiago determined which files would be audited [page 9 of P's Opp.].

According to Plaintiffs, it is a fact that the New Mayor determined which files would be audited, implying that a hidden political agenda was involved. Plaintiffs point to Co–Defendant Ms. Delgado's deposition [page 213 of Exhibit 4 to Ps Opp.]. However, upon closer inspection of the same page, such statement is not truly supported by the record. Ms. Delgado clarified during the same deposition [*see also* page 235 of Exhibit 4 to Ps Opp.] and stated in her affidavit [page 4 of Exhibit I to Ds' SUMF] that all the employee files were reviewed. This statement is in accordance with the New Mayor's affidavit [pages 3–4 of Exhibit A to Ds' SUMF].

### 3. Municipal Employees who Performed the File Review did not Receive any Particular Training [page 9 of Ps' Opp.].

Now, this statement may be evidence of incompetence, but not of discriminatory animus [pages 234–35 of Exhibit 4 to Ps' Opp.] and certainly not of concerted discriminatory action. Co–Defendant Ms. Delgado articulated the methodology to be followed by the municipal employees performing the review. It included (1) identifying all the positions that had been held by the employees since they began working for the Municipality, (2) reading the evaluations received by the employee while he or she held each position, (3) checking their educational background, (4) comparing the educational background with the duties associated with the positions, (5) reviewing documentation justifying any changes in position, among others [pages 234–35 of Exhibit 4 to Ps' Opp.].

### 4. Defendants used hand-picked municipal employees to review the several hundred personnel files in search of irregular transactions [page 5 of Ps' Opp.].

Once again, the Court is at a loss as to how it would matter if the reviewers had

been chosen in any other way. We assume that this is a bleak effort to show that the review process was tainted by political animus. There is absolutely no evidence that the employees chosen for the personnel file review (i) shared any qualities, (ii) made decisions based on political reasons or (iii) made decisions that were not color-blind. In fact, there is evidence supporting the opposite supposition. The New Mayor stated the following in his affidavit:

> The measures that we took ... affect all the municipal employees, regardless of their personal circumstances or their political affiliations. In fact, employees that are affiliated with the [PPD] have also received letters of intent from me stating that some of the personnel transactions that concerned them were null and void and that the Municipality has no choice but to reverse them [pages 5–6 of Exhibit A to Ds' SUMF].

In addition, he has kept over nine (9) NPP members as part of the New Mayor's Office, including the former mayor's personal secretary. He has named various persons to trust positions regardless of the fact that they are associated with the NPP. Examples of these are the Internal Auditor of the Municipality and an Assistant to the New Mayor [pages 5–6 of Exhibit A].

### D. Legal Analysis Conclusion

Defendants have shown with documentation and affidavits that they had legitimate reasons (i) to believe that the 1997 Changes were a new plan (including the view of governmental agencies) and (ii) for re-classifying Plaintiffs. Defendants have also shown that they did such re-classification in accordance with the law and at the instance of the Comptroller, a man appointed by the NPP former governor. In addition, they have provided evidence of non-discriminatory animus. The New Mayor stated that there are NPP members working closely with him in his office and that the personnel actions affected members of the PDP. Both statements have remained uncontested. And what have Plaintiffs done? They have shown the Court that there is a good-intentioned employee at the Municipality. They have shown that reasonable parties can disagree with respect to the legal nature of a document.

What Plaintiffs have not done is "provide the district court with information that would suggest that [their assertions about discrimination] had any factual support" (*Kauffman*, 841 F.2d at 1172). Plaintiffs are asking this Court to conclude that supporting a particular characterization of the 1997 Changes is equal to acting with discriminatory animus. We cannot adopt such conclusory allegations at the summary judgment stage. Defendants have provided solid evidence of a lack of discriminatory animus. Plaintiffs have provided the Court with nothing to suggest that the NPP's were treated differently due to their political ideas. For example, Plaintiffs have not provided factual support to show any of the following: (1) that Defendants knew of Plaintiffs' political affiliation,[17] (2) that the re-classification to the 1991 Plan was differentially or discriminately applied (*see Acevedo–García*, 204 F.3d at 15, where the contested facts included the application of seniority criteria and the offering of municipal positions to terminated employees), or (3) that PDP members benefited from the re-classifications of NPP members or were treated differently (*see Kauffman*, 841 F.2d at

---

17. However, the Court is aware that the previous administration had been NPP for 24 years prior to the 2000 general elections, so there were probably not many PPD employees at the Municipality.

1172). The Court recognizes that in many First Amendment cases, there are factual questions of motivation incapable of resolution on summary judgment. However, this is not one of them. To summarize, they have failed to adequately contest the evidence provided by Defendants on their lack of discriminatory animus.

In this case Plaintiffs have failed the first prong of the qualified immunity test. They have failed to show a constitutional violation because they have not provided the Court with evidence of political animus. The Court will not address the second and third prongs of the qualified immunity test because it is unnecessary. Once there is a negative answer to the first prong, "there is no necessity for further inquiries concerning qualified." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. Therefore, the Court holds that Defendants are entitled to the qualified immunity defense.

### E. Claims Remaining Against Defendants

The Court has addressed its finding of the New Mayor's and Ms. Delgado's entitlement to the qualified immunity defense against the First Amendment claims of all Plaintiffs except those Plaintiffs who allegedly suffered only harassment. With respect to the claims of statutory punitive damages by Plaintiffs other than those Plaintiffs who allegedly suffered only harassment, we dismiss those as well. These claims were against the same Co–Defendants in their personal capacity, and they are immune.

The Court has not analyzed the qualified immunity defense in the context of the Plaintiffs who alleged harassment. Therefore, such claims remain against Co–Defendants the New Mayor and Ms. Delgado in their personal capacity.

There also remain the First Amendment claims against these Co–Defendants, in their official capacity, and the Municipality.

## V. CONCLUSION

The Court hereby **GRANTS** Defendants' requests (docket No. 64) and (i) **DISMISSES** the due process claims against all Defendants, (ii) **DISMISSES** the punitive damages claims of all Plaintiffs, other than those Plaintiffs who allegedly suffered only harassment, against all Defendants, **WITH PREJUDICE,** and (iii) **FINDS** that Defendants, in their personal capacity, are entitled to the qualified immunity defense against the First Amendment claims, other than those of Plaintiffs who allegedly suffered only harassment, and therefore **DISMISSES** the First Amendment claims (other than those of Plaintiffs who allegedly suffered only harassment) against the New Mayor and Ms. Delgado, in their personal capacity, **WITH PREJUDICE.**

**IT IS SO ORDERED.**