SUPERIOR COURT 
 
 PETER ANTONELLIS vs. DEPARTMENT OF ELDER AFFAIRS AND ANN HARTSEIN, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS SECRETARY OF ELDER AFFAIRS

 
 Docket:
 15 00405
 
 
 Dates:
 December 21, 2018
 
 
 Present:
 
 
 
 County:
 SUFFOLK, ss.
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
 
 

 In this action, Plaintiff Peter
Antonellis, a former employee of Defendant Department of Elder Affairs
("Department," and as Executive Office of Elder Affairs, or
"EOEA") and Ann Hartstein, the former Secretary of EOEA, in which he
initially alleged claims for violations of the First Amendment under 42 U.S.C. '1983 (Count I) and for violation of the
Whistleblower statute, G.L. c. 149, '185
against EOEA and Hartstein, individually and in her official capacity as
Secretary. By order dated July 23, 2015, this Court dismissed Count I against
EOEA and as against Hartstein in her official capacity, and dismissed Count II
as against Hartstein individually and in her official capacity. That left a
claims against Hartstein individually as a defendant in Count I, and against
EOEA as a defendant in Count II. Presently before the Court
Defendants' motion for summary judgment on the remaining claims. In addition,
Defendant move to strike the additional facts adduced by Antonellis in response
to their motion.[1]   ---------------------------   [1]Counsels' vigorous advocacy in
this case has been extraordinarily helpful to the Court is resolving the
present motions.   -1-   Defendants' motion to strike is
ALLOWED IN PART. As reflected in the facts accepted by the Court detailed
below, where Plaintiff has failed to simply and clearly dispute a material
fact, or has failed to respond at all, that fact is deemed admitted. See Rule
9A(b)(5), Sup. Ct. R. The Court ignores all non‑factual information Plaintiff
includes in his responses and in the additional facts he seeks to assert. For the reasons below, and in light
of the arguments made by counsel, Defendants' motion for summary judgment is
ALLOWED. BACKGROUND Summary judgment is appropriate
when the record shows that "there is no genuine issue as to any material
fact and that the moving party is entitled to judgment as a matter of
law." Mass. R. Civ. P. 56(c); see DuPont v. Commissioner of Corr., 448
Mass. 389, 397 (2007). The moving party bears the initial burden of
demonstrating that there is no triable issue and that he or she is entitled to
judgment. Ng Bros. Constr., Inc. v. Cranney, 436 Mass. 638, 644 (2002), citing
Pederson v. Time, Inc., 404 Mass. 14, 17 (1989); Kourouvacilis v. Gen. Motors
Corp., 410 Mass. 706, 716 (1991). In reviewing a motion for summary judgment,
the Court views the evidence in the light most favorable to the non‑moving
party and draws all reasonable inferences in his or her favor. Jupin v. Kask,
447 Mass. 141, 143 (2006), citing Coveney v. President & Trs. of the
Coll.  of the Holy Cross, 388 Mass. 16
(1983); see also Simplex Techs., Inc. v. Liberty Mut. Ins. Co., 429 Mass. 196,
197 (1999). Plaintiff began working for EOEA in
2000 as an assistant general counsel. In 2006, Plaintiff asked to be
transferred to the assisted living unit as a Program Coordinator II. A Program
Coordinator II at EOEA is also known as certification specialist. Plaintiff
never worked at EOEA as a "Compliance Officer," a title which did not
exist at the agency,   -2-   As a certification specialist,
Plaintiff's responsibilities included reviewing assisted living residences for
certification and re‑certification. Plaintiff also conducted site visits,
documented his findings, and drafted and helped to implement any corrective
actions plans. In addition, when a public records request came to Plaintiff
from his supervisor, Plaintiff identified responsive records and prepared them
for response. EOEA's policy for responding to public records requests provided: For all EOEA staff...as soon as a
request is received, please send it to the Legal Unit....We will ask you to
identify and compile the documents that may be responsive and provide us with a
print copy of the documents ....We will review the materials for responsiveness
and determine what needs to be redacted and the cost issue. Lastly, we will let
you know what final sub‑set of materials, as redacted, are ultimately turned
over to the requesting party. When Plaintiff served as assistant general counsel, he
gathered the materials in response to the public records requests and forwarded
them to the general counsel for review. EOEA had a protocol for media
requests. It provided that "press inquiries or communication issues should
be directed to Martina Jackson," the Communications Director at EOEA.
Personal information about residents in facilities under EOEA's jurisdiction is
protected from disclosure under G.L. c. 66A in the absence of consent to
disclose from the resident or his or her representative. Beginning in 2009, Plaintiff raised
concerns to his supervisors about EOEA's oversight of assisted living
residences, including: (1) a lack of a clear policy or practice for
investigating and tracking incident reports; (2) inability to properly oversee
and regulate special care residences; (3) disorganization and understaffing at
EOEA; (4) delays in the investigation of serious incidents at assisted living residences;
and (5) lack of a computerized process for tracking incident reports. Plaintiff
complained to his colleagues and supervisors about some or one of these
concerns on a monthly basis between 2010 and 2014. During 2013, Plaintiff had
concerns   -3-   about the Department's ability to follow up on critical
incidents, including suspicious deaths and overdue suspensions of specific
assisted living residences. On the morning of March 6, 2013,
Plaintiff attended a work meeting prior to a webinar regarding EOEA's
electronic incident reporting system, but left early. Plaintiff did not tell
his supervisor, Duamarius Stukes, that he was leaving the office. Upon leaving
the office, Plaintiff went to the Governor's Office to request a meeting about
concerns he had about elders. He filled out a request form at the Governor's
Office, but was unable to meet with the Governor, and thereafter went home. The
next day, March 7, 2013, Plaintiff did not report to the Boston office of EOEA,
where he normally worked, but instead conducted a site visit outside of the
office. On March 27, 2013 Antonellis
received notice of a one‑day suspension for leaving the meeting on March 6 and
not reporting to the Boston office the following day. Plaintiff grieved his one‑day
suspension, and the parties settled with an agreement reducing Plaintiffs one‑day
suspension to a formal warning. After Plaintiff's visit to the
Governor's Office, Hartstein, through her staff, received a call from the
governor's office reporting that Antonellis was asking for a meeting with the
governor. Hartstein asked EOEA's General Counsel, Stan Eichner, to follow up.
Eichner asked Plaintiff to provide a memorandum explaining his basis for his
perception that elders were at risk. Eichner informed Plaintiff that the
assignment was "a top priority" and "supersedes [his] other
assignments." On March 19, 2013, Plaintiff provided a 7‑page memorandum to
Eichner entitled "Elder Endangerment," which included 30 exhibits,
among them emails and incident reports. In response to it, EOEA Secretary
Hartstein asked Eichner to conduct an investigation. Three months later, by
letter dated June 27, 2013, Hartstein informed Plaintiff that "General
Counsel Eichner has reviewed each of the serious allegations relevant to your
concern that   -4-   Massachusetts elders are at risk and has found that this
perception is not substantiated. I concur with his findings." Providence Cliff House
("PCH") was a facility in Athol, Massachusetts, which first applied
to be certified as an assisted living residence in 2012. Plaintiff reviewed
PCH's application and conducted site visits as part of his job
responsibilities. EOEA denied certification in 2013. By July, 2014, PCH again
applied for certification as an assisted living residence. Plaintiff reviewed
PCH's second application and conducted site visits at PCH. EOEA denied PCH's
application on September 12, 2014. PCH appealed E0EA's decision on September
15, 2014. A hearing on PCH's appeal was scheduled for September 30, 2014. At one time, PCH had issues with
the Board of Health in Athol ("BOH"). However, on August 4, 2014, the
BOH informed the owner of PCH that A[a]s
of August 4, 2014 the remaining violation of the MA Sanitary Code.. .has been
corrected. As of today all violations cited in earlier letters have been
corrected." Plaintiff received a copy of the August 4, 2014 letter from
the BOH on August 4, 2014. Media outlets were interested in
E0EA's work. Kay Lazar, a health reporter for the Boston Globe, interviewed
Hartstein many times. In December, 2013, Colman Herman, a reporter for another
media outlet, Commonwealth magazine, submitted a public records request to EOEA related to assisted living facilities, including
records for PCH. Stukes asked Plaintiff to assist with responding to Herman's
request, which he did. However, the public records request was only partially
answered by July, and Herman sent several emails to various individuals at EOEA
and elsewhere demanding a complete response and threatening to appeal the
denial of his request. EOEA did not finish responding to Herman's December 11,
2013 public records request until November 2014.   -5-   In June or July, 2014, Plaintiff
received an email from within EOEA concerning Herman's public records request.
After receiving this email, in or about August 2014, Plaintiff contacted
Herman. Plaintiff was not instructed or asked by anyone at EOEA to do so.
Thereafter, Plaintiff met with Herman in person on three occasions and also
spoke with him over the phone, and discussed the concerns Plaintiff had raised
in his March 19, 2013 memo to Eichner and about PCH. Again, Plaintiff was not
instructed or asked by anyone at EOEA to do so. Further, Plaintiff gave Herman
EOEA documents, including a copy of his March 19, 2013 memorandum, some of the
exhibits that had been attached to it, and a copy of a report dated February 7,
2013, that Plaintiff sent to Stukes concerning a site visit to PCH, from which
Plaintiff asserts he redacted the residents' names. In the February 7, 2013
report, Plaintiff described a resident as "wheelchair bound and seemingly
incoherent" and another as "hearing impaired C
only communicates in writing." Plaintiff also gave Herman a report, dated
February 14, 2013, concerning a site visit at PCH. EOEA did not authorize
Plaintiff to provide documents to Herman. Plaintiff also spoke with Lazar about
his objections to E0EA's practices. Speaking to the Boston Globe and
Commonwealth was not part of Plaintiff's job duties. Plaintiff did not inform
his supervisor or management at EOEA that he was going to contact Herman or
give him EOEA documents, or that he was going to speak with Lazar. Plaintiff contends that his purpose
in providing information to Herman was to get EOEA's attention to address his
concerns and provide no standards by which Plaintiff and his colleagues were
conducting investigations and taking particular actions, thereby improving
assisted living residences and the department's oversight of them. On September 12, 2014, Commonwealth
published an article, written by Herman, entitled "Oversight questions
raised on Elder Affairs." In it, Herman quoted Plaintiff, who was   -6-   identified as a "compliance officer," and quoted
from Plaintiff's March 19, 2013 memorandum. It also described Plaintiff as
believing that "the agency does almost no analysis of the data it is
gathering [and] the agency cannot say how many people have fallen down,
wandered off, been abused, or exploited." After being notified of the article
and reading it, Hartstein wanted to "possibly discipline" Plaintiff
and on September 12, contacted Rhett Cavicchi, the Director of Labor Relations
of the Executive Office of Health and Human Services ("EOHHS") who
was assigned to EOEA about that intention. On September 21, 2014, the Boston
Globe ran a story by Lazar entitled, "Elder advocates raise concerns about
Assisted Living." The article described three incidents in which residents
of assisted living residences (ALRs) were injured, and stated that residents at
ALRs were in "harm's way too often" because EOEA "was "ill‑equipped
to protect these increasingly frail residents." The article referred to
Plaintiff as a "key staffer" who was worried that the EOEA did not
have the staff to regulate the industry. The Globe reported that Plaintiff said
"the agency had just two ombudsman to handle the thousands of complaints
that pour in each year involving assisted living residences." The article
cited Plaintiff as having repeatedly told his superiors that reports of serious
incidents were "languishing for weeks or months" and no one analyzes
them for patterns that point to larger issues. The article also stated that a
"spokeswoman at Elder Affairs disputed Antonellis' assessment." The
Globe described Plaintiff as a "compliance officer" for the
Department in the article. Martina Jackson, EOEA's Director of Communications,
spoke with Lazar before the article was published and told her that Plaintiff
was not a compliance officer.   -7-   On September 23, 2014, Commonwealth
published another article by Herman about EOEA entitled "Elder Affairs
lets Athol facility remain open," which again quoted Plaintiff and
discussed PCH, a subject of Herman's public records request of December 2013
that remained outstanding. In the September 23, 2014 article, Plaintiff was
again described as a "compliance officer" and was quoted as saying,
"I think that right at the outset Providence Cliff should have been given
90 days to shut down and a plan developed to relocate the residents."
Plaintiff confirmed he made that statement to Herman. The September 23, 2014
article also quoted from Plaintiff's PCH site visit reports, dated February 7,
2013 and February 14, 2013, and stated: "Antonellis noted that a number of
the residents were wheelchair‑dependent, one of whom was seemingly
incoherent." That statement came from Plaintiff's February 7, 2013 site
report. The article also mentioned the memorandum that Plaintiff sent to EOEA
in March 2013 detailing his concerns that poor management was endangering the
safety of residents in ALRs. A relative of a PCH resident saw
the September 23, 2014 article and testified he believed the statement "a
number of the residents were wheelchair‑dependent, one of whom was seemingly
incoherent" referred to his mother, a resident there. Neither Herman nor
Plaintiff had permission from the resident or her relative to describe her in
the article. The resident's relative subsequently submitted an affidavit to
Sheila Anderson at EOHHS, which stated: Based on the description provided
and the limited number of residents currently at Providence House, I
immediately identified my mother as being the resident described in the article...I
mentioned that I was unhappy with the release of information when I attended an
informal review for Providence Cliff House in Boston on September 30, 2014, and
I object to the terminology used in the description of my mother. On September 26, 2014, Commonwealth
published a third article by Herman about EOEA that quoted Plaintiff, entitled
"A critic from within." That article focused exclusively on
Plaintiff, and stated he was a "compliance officer with the state's Elder
Affairs office [who] has   -8-   become his agency's biggest critic." In the article,
Plaintiff was again described as a "compliance officer," and stated
that "[for another story, [Plaintiff] shared internal emails and documents
with Commonwealth that indicate Elder Affairs let an Athol facility operate as
an assisted living residence even though it wasn't certified and it was
unsafe." The article included Plaintiff's description of a recent meeting
during which he shared his concerns with two EOEA officials and his views that
a huge problem was that EOEA treated assisted living as a residential model,
when in reality it was a medical model because many of the residents had
serious medical issues like dementia and that the responsibility for regulating
assisted living should be moved to the Department of Public Health. Plaintiff
was praised in the article by former state inspector general Gregory Sullivan:
"Every citizen in Massachusetts should pause a moment and think of the
courageous actions of people like Peter Antonellis. It takes somebody who has
guts, integrity, and selflessness to do what he has done." Hartstein later testified that she
believed that Plaintiff believed that he was speaking out on matters of public
safety, but that Plaintiff's statements were detrimental to ALR residents
because "he was appearing to say that it was unsafe for residence for them
to be in, which was very upsetting to the residents who were living there at
the time." She also testified that Plaintiff's statement that EOEA did not
have adequate oversight ability was "very detrimental both to the Agency's
reputation and to the residents who lived in" ALRs. PCH's appeal hearing before EOEA
was scheduled for September 30, 2014, four days after this article appeared. On October 6, 2014, a meeting was
scheduled with Hartstein to discuss the "operational impact on the
decision" they were going to make on Plaintiff. On October 14, 2014,
Plaintiff   -9-   was informed he was placed on paid administrative leave
"pending the completion of an investigation into multiple instances of
potentially inappropriate and unprofessional conduct." In the following investigation, an
EOHHS Labor Relations Specialist, Sheila Anderson, interviewed Plaintiff on
October 16, 2014. Carrie McCoy, another Labor Relations Specialist, was present
at the interview and took notes. In her report, Anderson wrote that she
"asked Plaintiff if he provided any emails, documentation or communication
to Mr. Herman, and he responded in the negative." The first finding in the
resulting investigation report, titled "Media Policy Violation,"
states in part: "Press inquiries or Communication issues should be
directed to Martina Jackson at ex. 2‑7429." It further states that:
"Mr. Antonellis initiated direct contact with Mr. Herman without being
instructed to do so by his supervisor or consulting with Martina Jackson (the
EOEA Communications Director). Such contact constitutes a violation of E0EA's
Communications/Legislation Protocols." The report also found that
Plaintiff provided a false statement to the media because he affirmatively
stated that EOEA had two ombudsman to handle thousands of complaints. On October 27, 2014, Plaintiff
received notification by letter of the allegations against him and a show cause
hearing to address them. The letter stated that EOEA was contemplating
discipline, up to and including termination, for alleged violations of the
public records request protocol, violations of Massachusetts general laws for
describing a resident with specific details, making prejudicial statements
regarding an ALR, misstating facts to outside media sources, falsely
identifying his position in the agency, and not being truthful during the investigation. A show cause hearing was conducted
on November 3 and 6 before Christopher Groll, a Labor Relations Specialist and
Hearings Officer to determine whether Plaintiff should be disciplined.
Plaintiff was represented by counsel at the show cause hearing and testified on
his   -10-   own behalf. The "hearing was.. .to determine what
action, if any, would be taken against [Plaintiff] as the result of any or all
of the following allegations:" (1) he "violated policies, procedures
and expectations when [he] failed to adhere to public records request
protocol;" (2) he "violated Massachusetts General Laws as well as the
reasonable expectations of the agency when [he] described a resident with
specific details which could reasonably be considered disclosing the resident's
identity;" (3) he "made prejudicial statements regarding an Assisted
Living residence while an appeal process was pending thereby potentially
undermining the ability of the agency to undertake the appellate process;"
(4) he "made statements to outside media sources that misstated the facts
and disparaged the reputation of the agency;" (5) he "falsely
identified [his] position with the agency;" and (6) he was "not
truthful and forthcoming during the course of the investigation." After the hearing. Groll sustained
all six claims against Plaintiff. As to the first, Groll concluded
that Plaintiff "provide[d] internal EOEA emails and other documents, as
well as information to media outlets in 2014, in violation of EOEA
protocols." Groll also found "Antonellis was aware of EOEA's
protocols regarding public record requests and media inquiries at the time he
provided information and documents to the media in 2014" and that
"[a]lthough Mr. Antonellis testified that he was aware of the agency's protocols
while he served as an Assistant Legal Counsel, he nevertheless claimed that he
was no longer aware of them while he served as a Certification
Specialist." Groll found it to be "highly unlikely that [Plaintiff]
would forget what the protocols were simply because he switched positions
within EOEA." As to the second ground, Groll
concluded that Plaintiff "provided personal data about an ALR resident in
violation of the Fair Information Practices Act (M.G.L. c. 66A)" because
"the   -11-   statute expressly includes 'description' within the
definition of personal data" and the relative of the PCH resident
"was clearly able to identify their relative based on a description
provided to the media by Mr. Antonellis...the only finding can be that he
violated these provisions." As to the third issue, Groll found
Plaintiff criticized PCH while its appeal was pending, "thereby
potentially undermining the ability of EOEA to undertake its responsibilities
in the appellate process." As to this issue, Groll stated that "a
potential argument exists for Mr. Antonellis that the comments attributed to
him...[are] protected speech under the First Amendment." However, Groll
found that "the problem for Mr. Antonellis in this instance is that the
information he provided to the media about PCH was knowingly incomplete"
because Plaintiff "had personal knowledge as early as August 5, 2014 that
the health and sanitary violations referenced in the internal emails he
provided to Herman were both outdated.. .as PCH had been cleared of these
violations by the [BOH] ... [W]hen these old and inaccurate claims surfaced in
a news article a week before the meeting on PCH's appeal, and were directly
attributed to Mr. Antonellis, there can be no doubt that they had a prejudicial
effect on EOEA's ability to appear neutral and fulfill its appellate
responsibilities." As to the fourth issue, Groll found
that Plaintiff could also allege his First Amendment rights in defense of the
allegation that he "made multiple statements to outside media sources that
misstated facts and/or disparaged the reputation of EOEA." However, Gross
found that as Plaintiff "readily acknowledged, both in his investigative
interview and at the Show Cause hearing, that some of these statements were
factually incorrect." Groll rejected Plaintiff's claim that he was
misquoted or that someone else was the source, and "considering that many
of these statements were based on documents he supplied, it is more probable
than not that he was accurately quoted in the various articles. And since he
was clearly aware that some of these   -12-   statements were factually inaccurate, he cannot avail
himself of the protections afforded by the First Amendment." As to the fifth issue, that
Plaintiff falsely identified himself as a compliance officer, Groll concluded
that "there can be no finding other than he unquestionably did so... .In
doing so, he undoubtedly, and most likely intentionally, lent an air of added
credibility to his claims against EOEA and PCH." Finally, as to the sixth issue,
Groll wrote that "there is the most damaging allegation against
[Plaintiff], that he was not truthful and forthcoming during the course of
EOEA's investigation. Here, the overwhelming preponderance of the evidence
presented at hearing readily satisfies Management's burden in proving this
claim" because "[b]oth Sheila Anderson and Carrie McCoy testified
that [Plaintiff] was directly asked if he had provided any emails or documents
to Herman or any other members of the media, and he said no, a fact
corroborated by Ms. McCoy's contemporaneous notes of the interview." As a result, Groll concluded that
"Management has established by a preponderance of the evidence the
veracity of all six (6) allegations against [Plaintiff]. ...disciplinary
action, up to and including termination is appropriate and should be imposed in
this matter," in part because Plaintiff irreparably damaged the
relationship of trust between him and EOEA. By letter dated November 26, 2014,
Hartstein terminated Plaintiff's employment, "[a]fter reviewing the
evidence produced at the hearing, the designated hearing officer reported his
findings to me.. .which I adopt," which "indicate that you engaged in
egregiously inappropriate and unprofessional behavior." She added,
"EOEA no longer has the requisite trust and confidence in your ability to
carry out your job duties in an appropriate and professional manner."   -13-   DISCUSSION A. 42 U.S.C. 1983 Claim against
Hartstein To prove a claim under 42 U.S.C. '1983 for retaliation in violation of
the First Amendment, Plaintiff must establish three things: (1) that he was
speaking "as a citizen on a matter of public concern"; (2) that his
interests, "as a citizen, in commenting upon matters of public
concern" outweighed his employer's interest "in promoting the
efficiency of the public services it performs through its employees"; and
(3) "that the protected expression was a substantial or motivating factor
in the adverse employment decision." O'Connell v. Marrero-Recio, 724 F.3d
117, 123‑24 (1st Cir. 2013), citing Decotiis v. Whittemore, 635 F.3d 22, 29
(1st Cir. 2011), quoting Curran v. Cousins, 509 F.3d 36, 44‑45 (1st Cir. 2007). Even if Plaintiff establishes these
three elements, a Defendant escapes liability if he or she shows an entitlement
to qualified immunity, an affirmative defense. DiMarcoCZappa
v.  Cabanillas, 238 F.3d 25, 35 (1st Cir.
2001). "[Q]ualified immunity shields government officials performing
discretionary functions from civil liability for money damages when their
conduct does not violate clearly established statutory authority or
constitutional rights of which a reasonable person would have known." Id.
(citation, quotation omitted); see also Baker v. Gray, 57 Mass. App. Ct. 618,
622 (2003); Ahmad v. Department of Correction, 446 Mass. 479, 484 (2006). A
defendant can show that qualified immunity applies if he or she shows that,
even if there was a violation of the plaintiffs Federal constitutional or statutory
rights, at the time of the violation, those rights were not clearly established
and a reasonable person in the defendant's position would not have understood
that his or her conduct violated them. See Nelson v. Salem  State College, 446 Mass. 525, 531 (2006); see
also Saucier v. Katz, 533 U.S. 194, 200‑201 (2001); White v. Gurnon, 67 Mass.
App. Ct. 622, 627 (2006).   -14-   Although an inquiry into whether
there is qualified immunity is "separate and distinct" from the
assessment of merits of plaintiffs case, they sometimes "overlap" in
that the first element of the claim and the first question to be addressed in
determining whether qualified immunity applies both turn on whether Plaintiff
can prove that the Defendant violated his or her First Amendment rights. See
Clancy v. McCabe, 441 Mass. 311, 322 (2004), quoting Camilo-Robles v. Hoyos,
151 F.3d 1, 7 (1st Cir. 1998). The threshold inquiry on this issue is whether
Plaintiff spoke as a citizen and on a matter of public concern. See Decotiis,
635 F.3d at 29, citing Curran, 509 F.3d at 45 and Pickering v. Bd. of Educ.,
391 U.S. 563, 568 (1968); Cristo, 90 Mass. App. Ct. at 589 (first factor has
two subparts: whether the plaintiffs were speaking as citizens and whether the
subject of the speech was of public concern). If Plaintiff spoke "pursuant
to [her] official duties," the speech would not constitute citizen speech
subject to First Amendment protection, since "restricting speech that owes
its existence to a public employee's professional responsibilities does not
infringe any liberties." Garcetti v. Ceballos, 547 U.S. 410, 421‑22
(2006). Determining whether Plaintiff spoke
in his official or private capacity is not as easy as either side would have
it. "In Garcetti v. Ceballos, the Supreme Court held that "the First
Amendment does not prohibit managerial discipline based on an employee's
expressions made pursuant to official responsibilities." The relevant
inquiry under Garcetti thus has two basic componentsC(1)
what are the employee's official responsibilities? and (2) was the speech at
issue made pursuant to those responsibilities?Cboth
of which are highly context‑sensitive." Mercado‑Berrios v. Cancel‑Alegria,
611 F.3d 18,26 (1st Cir. 2010) (citations omitted).   -15-   On the one hand, as Plaintiff
argues, Plaintiff was not authorized to speak to the Commonwealth writer[2] as
a representative of EOEA and that speaking to the press or public was not part
of his normal duties C
although a reader of Commonwealth might conclude to the contrary, since
Plaintiff portrayed himself as an EOEA "Compliance Officer." The fact
that the substance of what Plaintiff said was obtained by the Plaintiff during
his employment is not determinative; "Nile critical question under
Garcetti is whether the speech at issue is itself ordinarily within the scope
of an employee's duties, not whether it merely concerns those duties."
Lane v. Franks, 573 U.S. 228, 239‑40 (2014). On the other hand, Plaintiff, as
part of his job, was in the midst of assisting EOEA in responding to a public
records request made by Commonwealth and spoke about the substance of those
requests C and,
indeed, produced to Commonwealth, on his own and without authority from EOEA,
documents sought by Commonwealth. The First Circuit in Mercado‑Berrios
struggled with drawing the distinction between employee and citizen speech when
the two are muddled, as they are here. There, the issue was whether an
employee's complaints about her superiors' interference with her fulfillment of
her job responsibilities was protected under the First Amendment: The relevant question is whether
those complaints were made pursuant to her official responsibilities. That is not an easy question to
answer. On the one hand, MercadoCBerrios's
complaints were not made "pursuant to" her job duties in the most
literal sense. ... The record contains no hint that her superiors ... expected
her to raise broad policy and safety concerns in carrying out her official
duties. ... Garcetti can be read to suggest
that unofficial communications that are not "part of what [the plaintiff]
... was employed to do," like MercadoCBerrios's
complaints, fall outside the scope of its rule. The Supreme Court was
deliberate in its choice of words. It referred thirteen times to speech made
"pursuant to" an employee's job duties, most notably in its
statements of the question presented and the holding. Elsewhere, it described
the relevant   ---------------------------   [2] While Plaintiff also spoke to
the Globe, his comments to and actions regarding Commonwealth drive the analysis.   -16-   class of speech in similar
terms.[3] The Court did not expressly indicate that it meant to sweep more
broadly and include, for example, all speech that relates to, contributes to,
or incidentally facilitates the performance of official functions. On the other hand, some of the
considerations identified in Garcetti such as the importance of "affording
government employers sufficient discretion to manage their operations,"
may suggest a wider scope. Several courts of appeals, focusing on those cues,
have construed the decision to cover all speech made "during the course of
performing an official duty" that "reasonably contributes to or
facilitates the employee's performance of [an] official duty." On that
view, complaints like MercadoCBerrios's
might be unprotected, since they could be said to facilitate job performance by
removing (or attempting to remove) an obstacle. The D.C. Circuit has explicitly
embraced such a view. See Winder v. Erste, 566 F.3d 209, 215 (D.C. Cir.2009)
("[W]e have consistently held that a public employee speaks without First
Amendment protection when he reports conduct that interferes with his job
responsibilities, even if the report is made outside his chain of
command."). In short, there are strong
arguments that the "pursuant to official duties" doctrine of Garcetti
does not apply to MercadoCBerrios's
complaints to her superiors, but there are also strong arguments to the
contrary. Mercado‑Berrios, 611 F.3d at 27 (citations omitted). This case is thus not like
Pickering, 391 U.S. 563, where the issue was whether a teacher had a First
Amendment right to send a letter to a local newspaper in connection with a
proposed tax increase that was critical of the way in which the school board
and the district superintendent of schools had handled past proposals to raise
new revenue for the schools. That speech was related to, but sufficiently distant
from, the teacher's duties and was clearly the kind of speech citizens are
entitled to make. $ee also Lane, 573 U.S. at 240 (citation omitted)
("speech by public employees on subject matter related to their employment
holds special value precisely because those employees gain knowledge of matters
of public concern through their employment" and are thus "uniquely
qualified to comment' on 'matters concerning government   ---------------------------   [3]"For example, the Court
referred to speech that "owes its existence to a public employee's
professional responsibilities," speech that the employer "has
commissioned or created," speech that the employee "was paid to"
make, speech that the employee's "duties ... required him to" make,
speech that amounts to the employee's "work product," and speech that
is an "official communication[ ]." Mercado‑Berrios, 611 F.3d at 27
(citations omitted).   -17-   policies that are of interest to the public at large').
Here, some of what Plaintiff said constituted citizen speech C for instance, his criticism that EOEA
failed to properly analyze data it gathered to determine the number of
residents in assisted living facilities who suffered from falls and other
issues. That part of Plaintiff's speech also concerned a matter of public
concern and was the subject of legitimate news interest. Lane, 573 U.S. at 241;
see also Garcetti, 547 U.S. at 425 ("Exposing governmental inefficiency
and misconduct is a matter of considerable significance"). But other
expressive conduct in which Plaintiff engaged in connection with the
Commonwealth  interaction was not
protected by the First Amendment, such as disclosing EOEA documents without
authorization. But it is not necessary for this prong of the analysis to fully
catalogue which of Plaintiff's conduct fell on either side of the First
Amendment line; because some of Plaintiff's expressive conduct enjoyed First
Amendment protection, the Court concludes that Plaintiff has adduced sufficient
evidence on the first prong of the 42 U.S.C. '1983
analysis to survive Defendants' motion for summary judgment. Just because some of the speech at
issue is citizen speech, that "does not settle the matter' Lane, 573 U.S.
at 242; where that is the case, "the next question is whether the
government had an 'adequate justification for treating the employee differently
from any other member of the public' based on the government's needs as an
employer. ... [where] 'a stronger showing [of government interests] may be
necessary if the employee's speech more substantially involve[s] matters of
public concern" Id. at 242, citing Garcetti, 547 U.S. at 418, and quoting
Connick v. Myers, 461 U.S. 138, 150‑51 (1983). This is essentially a balancing
test, weighing the citizen's right to comment upon matters of public concern
against his or her employer's interest in promoting efficiency of the public
service it performs through its employees. "[G]overnment employers often
have legitimate `interest[s] in the effective and efficient   -18-   fulfillment of [their] responsibilities to the public,'
including "promot[ing] efficiency and integrity in the discharge of
official duties," and "maintain[ing] proper discipline in public
service." Lane, 573 U.S. at 242 (citations omitted). The parties joust over whether and
when Hartstein's motivation in terminating Plaintiff is relevant. It is, on
this prong of the analysis. See Mihos v. Swift, 358 F.3d 91, 103‑06 (1st Cir.
2004). On the undisputed record, however, the Defendant has demonstrated that
she had substantial reasons to terminate Plaintiff in fulfillment of her
responsibilities to the public, including promoting efficiency and integrity in
the discharge of official duties, and maintaining proper discipline, which
outweighed Plaintiff's interest in exercising his First Amendment rights. As
noted above, not all of Plaintiff's expressive conduct enjoyed First Amendment
protection. Further, Lane found that employee
speech that is "false or erroneous or ... unnecessarily disclosed any
sensitive, confidential or privileged information" weighs against
according it First Amendment protection. 573 U.S. at 242 (citations omitted).
Plaintiff's expressive conduct suffered from all three of these failings.
Plaintiff made erroneous, perhaps false, statements, such as about his title at
EOEA. He disclosed information about PCH which was outdated and hence conveyed
an erroneous impression. He revealed privileged information describing a PCH
resident in sufficient detail for her to be identified by a relative, in
violation of state law. $ee G. L. c. 66A, ''1,
2 (protecting from disclosure "personal data," defined to include any
"description [that] can be readily associated with a particular
individual"). Moreover, Plaintiff did not just speak, he provided EOEA
documents to the Commonwealth reporter which Plaintiff had no right to produce,
improperly bypassing EOEA's public records request response process, and spoke
at a time when the EOEA was considering PCH's appeal, which undermined EOEA's
ability to adjudicate that appeal. And, separately but seriously, Plaintiff was
untruthful when he was asked   -19-   by investigators whether he provided documents to
Commonwealth. Thus, while Plaintiff would have been privileged to comment about
EOEA's performance, he had no right to take any of these latter actions, which
Hartstein justifiably concluded diminished her trust in him. Hartstein thus has
shown that she had ample justification for taking action against Plaintiff
which was separate from Plaintiff's protected commentary about EOEA's
performance. Hartstein is thus entitled to summary judgment on this point
alone. Even were that not the case,
Hartstein would still prevail. The last prong of the '1983
analysis, which asks whether the protected expression was a substantial or
motivating factor in the adverse employment decision, is ordinarily a question
of fact for the jury, not a question of law. See Davignon v. Hodgson, 524 F.3d
91, 100‑‑01 (1st Cir. 2008); Garcetti 547 U.S. at 418-20. [4] But on the
undisputed facts, Plaintiff has not shown that his termination was attributable
to his exercise of First Amendment rights as opposed to those reasons outlined
by Groll and accepted by Hartstein which described conduct far outside of them.
See Mihos, 358 F.3d at 108 ("In short, the issue is the causal link
between the protected conduct and the adverse employment action"); Wagner
v. City of Holyoke, Massachusetts, 404 F.3d 504, 508 (1st Cir. 2005)
("While individuals are entitled to speak on matters of public concern
free from the threat of retaliation... this does not entitle those same
individuals to use whatever methods or instrumentalities they see   ---------------------------   [4]On this point, "the
employee must meet the 'burden of producing sufficient direct or circumstantial
evidence from which a jury reasonably may infer that his constitutionally
protected conduct ... was a 'substantial' or 'motivating' factor behind his
dismissal.' If an employee succeeds in establishing this causal relationship,
an employer can still defeat the claim 'by proving by a preponderance of the
evidence that the governmental agency would have taken the same action against
the employee 'even in the absence of the protected conduct." These two
criteria ... 'ensure[] that a plaintiff‑employee who would have been dismissed
in any event on legitimate grounds is not placed in a better position merely by
virtue of the exercise of a constitutional right irrelevant to the adverse
employment action." Diaz‑Bigio v. Santini, 652 F.3d 45, 51‑52 (1st Cir.
2011) (citations, footnote omitted). While EOEA had ample justification to
terminate Plaintiff, Groll's analysis should not necessarily stand as the last
word on this issue, as there is at least some evidence that Hartstein harbored
an interest in disciplining Plaintiff soon after the first Commonwealth article
appeared, before Groll uncovered the full details of Plaintiffs conduct.   -20-   fit to convey their message. If the use of such
inappropriate means of expressionCrather
than the speech itselfCprompts
discipline, there is no first amendment violation"). Even had Plaintiff prevailed on
this point, qualified immunity would still apply, meaning that even if
Plaintiff had a triable case on the merits, Hartstein would still be entitled
to judgment as a matter of law. In assessing qualified immunity, A[w]e apply a three‑part test which asks
`(1) whether the facts taken in the light most favorable to the plaintiff
demonstrate that there was a violation of the plaintiffs ... constitutional or
statutory rights; ... (2) if so, whether at the time of the violation those
rights were clearly established; and (3) whether a reasonable person in the
defendant's position would understand that his conduct violated those clearly
established rights." Krupien  v.
Ritcey, 94 Mass. App. Ct. 131 at *2 (2018) (citations omitted). "Qualified
immunity 'gives government officials breathing room to make reasonable but
mistaken judgments about open legal questions.' Under this doctrine, courts may
not award damages against a government official in his personal capacity unless
'the official violated a statutory or constitutional right,' and 'the right was
'clearly established' at the time of the challenged conduct.' The relevant
question for qualified immunity purposes is this: Could [Hartstein] reasonably
have believed, at the time he fired [Plaintiff], that a government employer
could fire an employee on account of' the acts in question? Lane 573 U.S. at
243 (citations omitted). As Plaintiff properly points out,
the principle that public employees have a protected First Amendment right to speak
out on issues of public concern without differing retaliation was well‑established
by 2013,[5] but that right was "not absolute." Diaz‑Bigio, 652 F.3d
at 51‑2 (citations,   ---------------------------   [5]Plaintiff also cited two prior
restraint cases in support of his qualified immunity argument, but those
decisions are irrelevant here. This was not an instance of prior restraint, and
neither case is controlling. In any event, one of the two non‑authoritative
cases he cited concluded that press policies restraining government employee
speech, like that at issue here, are not unlawful mr se. Harman v. City of New
York, 140 F.3d 111, 124 (2d Cir. 1998) ("This is not to say that any
policy that restricts speech beyond the information statutorily required to be
kept confidential could not withstand constitutional scrutiny. Given the City's
compelling interest in protecting such information, a less burdensome
regulation may well survive the [applicable] balancing test. We hold only that
the City has not met its burden to justify the comprehensive sweep of the
policies at issue here").   -21-   footnote omitted) ("The law is 'settled that as a
general matter the First Amendment prohibits government officials from
subjecting an individual to retaliatory actions ... for speaking out,' but this
prohibition is not absolute. `[I]n recognition of the government's interest in
running an effective workplace, the protection that public employees enjoy
against speech‑based reprisals is qualified"). The record here simply does not
show that a reasonable person in Hartstein's position would have known that
taking adverse employment action against Plaintiff under these facts violated
that clearly established right. On the contrary, the record shows that the Defendants
realized that Plaintiffs conduct was potentially protected by the First
Amendment B Groll's
report expressly recognizes this to be the case. But the fact that part of
Plaintiff's conduct constituted protected speech did not insulate the rest of
his conduct from employment action, a point recognized by the First Circuit: The general right ... to engage in
speech on matters of public concern without retaliation C
was clearly established ... But qualified immunity requires that the general
right be placed in a reasonably specific context; and given the facts
surrounding [a public employee's] discipline, this is not a case in which
reasonable officers, in light of clearly established law, "must have known
that [they were] acting unconstitutionally." To the contrary, [the
employee's] broad range of complaints (some consisting of unprotected and
antagonistic speech), coupled with his disregard of confidentiality protocols and
his disobedience in following the department's chain of command, would have
permitted a reasonable superior officer to believe that he was entitled to
discipline [him] regardless of the content of his speech, consistent with the
protections of the first amendment. Even if this reasoning were mistaken, it
would not have been egregiously so and, accordingly, qualified immunity is
available. Wagner, 404 F.3d at 509 (citations omitted). In light of the
undisputed facts which show that Plaintiff committed misconduct quite apart
from his protected conduct, such as lying to   -22-   investigators about providing EOEA documents to a reporter,
a reasonable supervisor in Hartstein's position would not have concluded that
taking adverse employment action against Plaintiff trampled his constitutional
rights. Indeed, in this case, Hartstein had the benefit of Groll's analysis of
Plaintiff's First Amendment "defenses," which found them lacking
after an adversary process in which Plaintiff participated, which informed her
that taking adverse action against Plaintiff would not trample his First
Amendment rights. Plaintiff has not shown any cogent reason to discount Groll's
analysis or Hartstein's decision to rely on it. Accordingly, even were the Court to
find a dispute of material fact over whether Plaintiff's activities were
protected by the First Amendment, Hartstein would be nonetheless entitled to
qualified immunity. Hartstein is entitled to judgment as a matter of law on
Count I. Count I is thus dismissed. B. G.L. c. 149, 4185 Claim A2ainst
EOEA Plaintiff brings a claim under the
Massachusetts Whistleblower Act, G.L. c. 149, '185
("MWA") against EOEA, but did not cite a subsection that statute
until he responded to the summary judgment motion filed by Defendants. He then
cited G.L. c. 149, '185(b)(1)
and (3). Under those subparts, a public employer is prohibited from taking
"retaliatory action" against an employee because the employee
discloses an activity, policy or practice of the employer to a supervisor or
public body which the employee reasonably believes is in violation of the law
or because the employee objects to or refuses to participate in such activity,
policy or practice. G.L. c. 149, ''185(b)(1),
(b)(3). To qualify for protection under '185(b)(1),
but not under '185(b)(3),
an employee must first "br[ing] the activity, policy or practice ... to
the attention of a supervisor of the employee by written notice and ... afford[
] the employer a reasonable opportunity to correct the activity, policy or
practice." Id. '185(c)(1).   -23-   "Retaliatory action" is
defined in the statute as the "discharge, suspension or demotion of an
employee or other adverse employment action taken against an employee in the
terms and conditions of employment." G.L. c. 149, '185(a)(5).
The Act provides a private cause of action to any employee aggrieved by a
violation of the statute. G.L. c. 149, '185(d). "To prevail on an MWA claim,
an employee must show 'that he engaged in protected activity and that his
participation in that activity played a substantial or motivating part in the
retaliatory action.' The employer may subsequently avoid liability 'by
proffering a legitimate, nonretaliatory reason for the [adverse action].' The
burden then shifts back to the employee to 'adduce some significantly probative
evidence showing both that the proffered reason is pretextual and that a
retaliatory animus sparked his dismissal." Pierce v. Cotuit Fire Dist.,
741 F.3d 295, 303 (1st Cir. 2014) (citations omitted). Plaintiff concedes that his
disclosure to the media does not constitute a disclosure under '185(b)(1), but claims that his
statements to the media constitute an "objection" under '185(b)(3), arguing that the latter
section does not require the objection be made to "anyone in
particular." The argument that the Legislature intended to limit
statements to public bodies under '185(b)(1)
but not impose any restrictions for statements to the media under '185(b)(3) ignores the structure of the
statute. Sections (b)(1) and (c) permit disclosures to a public body C that is, an entity outside of the
employment relationship C
only after internal disclosure to a supervisor is made, unless there is a
compelling justification C
an emergency or similar pressing need C
to make an earlier disclosure to the public body. It would make no sense for
the statute to be read to so restrict disclosures to public bodies in favor of
earlier, internal disclosure, but permit unrestricted disclosures to the media.
The Court is required to give full effect to the entirety of a statute and to
read it to effect the Legislature's will. See Commonwealth v. Morgan,   -24-   476 Mass. 768, 777 (2017) (citations omitted) ("In
construing a statute, we strive to discern and effectuate the intent of the
Legislature. The plain language of the statute, read as a whole, provides the
primary insight into that intent. We do not confine our interpretation to the
words of a single section. To the extent that the meaning of a statute remains
unclear, we seek to 'ascertain the intent of a statute from all its parts and
from the subject matter to which it relates, and must interpret the statute so
as to render the legislation effective, consonant with sound reason and common
sense"). The Court rejects Plaintiff's proposed interpretation of '185(b)(3) as nonsensical. The objection
protected in that section of the MWA is an internal objection, not a public
objection through the media. With this understanding, Plaintiff
has shown that he did object within EOEA about elder care issues. As detailed
in section A above, EOEA has proffered legitimate, nonretaliatory reasons for
terminating Plaintiff. Plaintiff has failed to sustain his burden to adduce
some significantly probative evidence showing both that the proffered reason is
pretextual and that a retaliatory animus sparked his dismissal. Indeed,
Plaintiff has shown no facts to suggest that his internal complaints within
EOEA played any role, much less a substantial or motivating part, in his
dismissal. On the undisputed facts,
Plaintiff's claim against EOEA fails as a matter of law. EOEA is thus entitled
to judgment on Count II. ORDER For the foregoing reasons,
Defendants' motion to strike is ALLOWED IN PART and its motion for summary
judgment is ALLOWED. This case is thus DISMISSED.   /s/MICHAEL D. RICCIUTI Justice of the Superior Court December 21, 2018   -25-